Stephen Halladay **CROLL,**
**Petitioner-Appellee,**

v.

**Mei Yee CROLL, Respondent-**
**Appellant.**

**No. 99–9341.**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 22, 2000

Decided: Sept. 20, 2000

Robert D. Arenstein, New York, NY, for petitioner-appellee.

Lea Haber Kuck, New York, NY, for respondent-appellant.

Before: JACOBS, SOTOMAYOR, and MICHEL,* Circuit Judges.

Judge SOTOMAYOR dissents in a separate opinion.

JACOBS, Circuit Judge:

Petitioner-appellee Stephen Halladay Croll seeks an order compelling his wife, respondent-appellant Mei Yee Croll, to return their minor child, Christina Croll, to Hong Kong under the Hague Convention on the Civil Aspects of International Child Abduction, *done* Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10,494 (1986) ("Hague Convention" or "Convention"), implemented by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.* (1995). A custody decree issued in Hong Kong (a) confers the sole "custody, care and control" of Christina Croll on her mother, (b) confers "rights of access" on her father, and (c) bars the removal of the child from Hong Kong without the consent of the other parent or the court. The United States District Court for the Southern District of New York (Stein, *J.*) granted Mr. Croll's petition for an order of return subject to certain conditions, finding that Mrs. Croll had wrongfully removed Christina from Hong Kong in violation of the Convention. *See Croll v. Croll,* 66 F.Supp.2d 554, 562–63 (S.D.N.Y.1999).

---

* The Honorable Paul R. Michel, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

We hold that rights of access do not constitute rights of custody within the meaning of the Hague Convention, even when coupled with a *ne exeat* clause. Because courts in the United States have jurisdiction to enforce the Convention by ordering a child's return to her habitual residence *only* if the child has been removed in breach of a petitioning parent's *custodial* rights, the district court lacked jurisdiction to order return in this case.

## BACKGROUND

### A. *Facts*

Stephen and Mei Yee Croll, both United States citizens, were married in Hong Kong in 1982. Their daughter Christina was born in Hong Kong in 1990 and lived with both of her parents until they separated in 1998. While the separated couple remained in Hong Kong, Christina lived with her mother, and was regularly visited by her father.

At some point in 1998, Mr. Croll commenced divorce proceedings in the District Court of the Hong Kong Special Administrative Region, Matrimonial Causes. The custody order issued by the Hong Kong court—the only custody order applicable to this case—grants Mrs. Croll sole "custody, care and control" of Chistina and grants Mr. Croll a right of "reasonable access." *Croll v. Chiu*, No. 7211 of 1998, Order at 1 (Dist.Ct.H.K.Spec.Admin.Reg., Feb. 23, 1999). To aid the parties' rights under the Custody Order (Mrs. Croll's custody and Mr. Croll's access), a separate paragraph directs that Christina "not be removed from Hong Kong until she attains the age of 18 years" without leave of court or consent of the other parent. Mr. Croll contends that this *ne exeat* clause (set out in full in the margin[1]), which grants a veto power over any place of residence outside

Hong Kong, gives him rights of custody within the meaning of the Convention.

Mrs. Croll brought Christina to New York on April 2, 1999, intending (she says) that Christina would interview at schools in New York City, attend school for a few weeks, and then return to Hong Kong for the summer. But (Mrs. Croll admits) "[i]n the back of her mind" she intended to remain in the United States permanently. On April 8, 1999, Mrs. Croll filed an action in Family Court in New York County seeking custody, child support, and an order of protection. Those proceedings have been stayed pending the outcome of this federal action.

When Mr. Croll returned to Hong Kong from a business trip on April 7, 1999, he learned that his wife had gone with Christina to the United States. On April 22, 1999, Mr. Croll filed a missing persons report with the police in Hong Kong, and on May 14, 1999, he filed this petition in the Southern District of New York seeking Christina's return to Hong Kong pursuant to the Hague Convention.

### B. *Prior Proceedings*

Mr. and Mrs. Croll do not dispute that Christina, who lived in Hong Kong from her birth until arriving in New York in 1999, was "habitually resident" in Hong Kong within the meaning of Article 3 of the Convention. In addition, Mrs. Croll does not claim on appeal that any of the Convention's recognized exceptions to the petitioning parent's right of return apply here. The question in this case therefore is whether Mr. Croll held and actively exercised "rights of custody"—within the meaning of the Convention—when Christina was taken from Hong Kong.

Mrs. Croll moved in the Southern District to dismiss the petition on the ground

---

1. The custody order's *ne exeat* clause provides that Christina be not removed from Hong Kong without leave until she attains the age of 18 years but provided that if either parent to give a general undertaking to the Court to return the said child to Hong Kong when called upon to do so, and unless otherwise directed with the written consent of the other parent that parent, may remove the said child from Hong Kong for any period specified in such written consent.

that Mr. Croll could not claim "custody" of Christina and that therefore (a) the court lacked subject matter jurisdiction and (b) the petition failed to state a claim upon which relief could be granted. The court denied the motion to dismiss, granted Mr. Croll's petition, and ordered that Christina be returned to Hong Kong. The court reasoned that

> the Hong Kong order dated February 23, 1999 provides that Christina may not be removed from Hong Kong before her 18th birthday without either leave of court or both parents' consent. Accordingly, ... Mr. Croll had a right, along with respondent, to determine Christina's place of residence and he had a corresponding right of custody within the meaning of the Convention. Christina's removal from Hong Kong— her habitual residence—was in violation of her father's right of custody and was, therefore, wrongful pursuant to the Convention.

*Croll*, 66 F.Supp.2d at 559. The court granted Mrs. Croll's motion to stay its order of return pending expedited appeal to this Court. *See Croll v. Croll*, No. 99–3566 (S.D.N.Y. Oct.29, 1999).

## DISCUSSION

At issue on this appeal are two sets of rights recognized in the Convention to be distinct: rights of custody and rights of access. If Mr. Croll has custody rights, courts in the United States have jurisdiction to order return of Christina to Hong Kong, as the district court has done, and the duty to do so. If, however, Mr. Croll has the lesser rights of access, jurisdiction is lacking and Mr. Croll must rely on other remedies.

■ The proper interpretation of the Hague Convention is an issue of law, which we review *de novo*. *See Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 167 (2d Cir. 1997).

■ "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Alvarez–Machain*, 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (citing *Air France v. Saks*, 470 U.S. 392, 397, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), and *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 11, 57 S.Ct. 100, 81 L.Ed. 5 (1936)); *see also Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215 (2d Cir.1999) ("Treaties are construed in much the same manner as statutes.") (citing *Alvarez–Machain*, 504 U.S. at 663, 112 S.Ct. 2188). The text of the treaty must be interpreted "in accordance with the *ordinary meaning* to be given to the terms of the treaty in their context and in light of its object and purpose." Vienna Convention on the Law of Treaties, *done* May 23, 1969, art. 31.1, 1155 U.N.T.S. 331 (emphasis added). Where the text—read in the context of its structure and purpose—is ambiguous, we may resort to extraneous tools of interpretation such as a treaty's ratification history and subsequent operation. *See Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.") (internal quotation marks and citations omitted); *cf. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 n. 5, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) ("Even if the text were less clear, its most natural reading could properly be contradicted only by clear drafting history.").

So far as we can tell, we and the district court in this case are the only courts in the United States to consider whether rights of access coupled with a *ne exeat* clause confer "custodial rights" on a non-custodial parent within the meaning of the Hague Convention. We therefore start from scratch, and consult (A) the purpose and design of the Convention, (B) its wording, (C) the intent of its drafters, and (D) caselaw in other signatory states.

### A. Purpose and Framework of the Convention

The Hague Convention, to which the United States and Hong Kong are signatories,[2] was adopted as an effort "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble, 51 Fed.Reg. at 10,-498. The Convention rests on the principle that a child's country of "habitual residence" is "best placed to decide upon questions of custody and access." Elisa Pérez–Vera, *Explanatory Report: Hague Conference on Private International Law, in* 3 Acts and Documents of the Fourteenth Session (Child Abduction) 426, 434–35, ¶ 34 (1980) ("Pérez–Vera Report").[3]

In order to "preserve the status quo and to deter parents from crossing international boundaries" to secure a more favorable forum for the adjudication of custody rights, *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir.1999) (internal quotation marks omitted), the Convention provides for the return of children "wrongfully removed to or retained in any Contracting State." Hague Convention, art. 1, 51 Fed.Reg. at 10,498. A removal or retention is to be considered "wrongful" where:

> a) it is in breach of *rights of custody* attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the

child was habitually resident immediately before the removal or retention; *and* b) at the time of removal or retention those rights were *actually exercised*, either jointly or alone, or would have been so exercised but for the removal or retention.

*Id.* art. 3, 51 Fed.Reg. at 10,498 (emphasis added). Rights of custody "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *Id.*

■ Thus an order of return is available as a remedy *only* for wrongful removals or retentions, and removals or retentions are wrongful *only* if they are "in breach of rights of custody." The Convention defines rights of custody as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* art. 5, 51 Fed.Reg. at 10,498.

Rights of custody are distinguished from *rights of access*, which are defined in the Convention as "the right to take a child for a limited period of time to a place other than the child's habitual residence." *Id.* The Convention provides recourse in the event a child is removed from an habitual residence in breach of access rights, but those remedies *do not* include an order of return to the place of habitual residence. *See id.* art. 21, 51 Fed.Reg. at 10,500. To vindicate the breach of access rights, the Convention authorizes signatory nations to use one or more remedies (short of return) to "promote the peaceful enjoyment of ac-

**2.** The Convention remains in effect in Hong Kong following Hong Kong's absorption into the People's Republic of China in 1997. *See* Joint Declaration on the Question of Hong Kong, Dec. 19, 1984, U.K.-P.R.C., U.K.T.S. No. 26 (1985) ("Joint Declaration"). The Joint Declaration provides that "[i]nternational agreements to which the People's Republic of China is not a party but which are implemented in Hong Kong may remain implemented in the Hong Kong Special Administrative Region." *Id.* Annex I, pt. XI. The People's Republic of China is not a signatory to the Hague Convention, but on June 13, 1997, that country informed the Ministry of

Foreign Affairs of the Kingdom of the Netherlands at the Hague that, in accordance with the Joint Declaration, the Convention would continue to apply to Hong Kong after July 1, 1997.

**3.** The Pérez–Vera Report is recognized by the Hague Conference as "the official history and commentary on the Convention," and we have previously said that it is an authoritative source for interpreting the Convention's provisions. *Blondin v. Dubois,* 189 F.3d 240, 246 n. 5 (2d Cir.1999).

cess rights," and to "take steps to remove, as far as possible, all obstacles to the exercise of such rights." *Id.* One such remedy is a writ ordering the custodial parent who has removed the child from the habitual residence to permit, and to pay for, periodic visitation by the non-custodial parent with access rights. *See id.* art. 26, 51 Fed.Reg. at 10,500; *Viragh v. Foldes,* 415 Mass. 96, 612 N.E.2d 241, 246–50 (1993) (ordering a custodial parent who brought a child to the United States in frustration of a Hungarian access decree to pay the travel costs of visitation). The Convention makes plain that unless the petitioner has rights of custody, a court has no authority to order return.

In the United States, a petitioner claiming wrongful removal under the Convention may bring a petition for an order of return in a United States district court or in a court of any state. *See* 42 U.S.C. § 11603(a), (b). The court has the authority only to determine whether the child's removal was "wrongful" within the meaning of the Convention, *i.e.,* whether the removal "was in breach of custody rights" held by the petitioner. *See id.* § 11603(e)(1)(A). The petitioner bears the burden of proving "wrongful removal" by a preponderance of the evidence. *See id.* § 11603(e)(1). If the petitioner shows that the child was wrongfully removed, the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of four narrow exceptions apply. *See id.* § 11601(a)(4); *Blondin,* 189 F.3d at 245–46 (discussing enumerated exceptions). The court is not permitted to consider the merits of underlying custody disputes. *See id.* § 11601(b)(4).

### B. *Wording of the Convention*

We open the dictionary to find the ordinary meaning or meanings of "custody." *See Chan,* 490 U.S. at 128, 109 S.Ct. 1676 (looking first to Webster's Second International Dictionary to construe "irregularity" under the Warsaw Convention). Dictio-

naries support the idea that custody entails care, and in any event confirm the intuition that custody is something other and more than a negative right or veto.

*Black's Law Dictionary* defines custody generally as "[t]he care and control of a thing or person for inspection, preservation or security"; parental custody as "[t]he care, control, and maintenance of a child awarded by a court"; sole custody as "[a]n arrangement by which one parent has full control and responsibility to the exclusion of the other"; and joint (or shared) custody as "[a]n arrangement by which both parents share the responsibility for and authority over the child at all times." *Black's Law Dictionary* 390 (7th ed.1999); *see, e.g., Joyner v. Dumpson,* 712 F.2d 770, 778 (2d Cir.1983) ("[L]egal custody is concerned with the rights and duties of the person (usually the parent) having custody to provide for the child's daily needs—to feed him, clothe him, provide shelter, put him to bed, send him to school, see that he washes his face and brushes his teeth." (quoting *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 827 n. 17, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (internal quotation marks omitted))).

*Webster's Third* defines custody as a "duty of guardianship and preservation ... protection, care, maintenance, and tuition." *Webster's Third New International Dictionary Unabridged* 597 (1986). The *Random House* dictionary defines custody as "keeping; guarding; care: *in the care of her father.*" *Random House Dictionary of the English Language* 357 (2d ed.1987) (emphasis in original).

Taking these definitions together, custody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc., or the (revocable) selection of other people or institutions to give these things. The dissent characterizes this as a "parochial definition" that reflects only "traditional American notions of custody rights," be-

cause it is distilled from American lexical sources. *Post* at 145. But this definition reflects none of the peculiar practices of American child-rearing; it includes an open-ended "etc."; and the dissent identifies no feature of custody that is missing except for the dubious addition of a *ne exeat* clause.

Nothing in the Hague Convention suggests that the drafters intended anything other than this ordinary understanding of custody. Article 5 of the Convention defines "rights of custody" generally as "*rights* relating to the *care of the person* of the child." Hague Convention, art. 5, 51 Fed. Reg. at 10,498 (emphasis added). The plural "rights" references a bundle of rights exercised by one or more persons having custody, and is in some tension with the idea (critical to the district court's opinion in this case) that one can have custody by holding a *single* power such as the veto conferred by a *ne exeat* clause.

■ Mr. Croll emphasizes that the Convention's definitional phrase "rights relating to the care of the person of the child" continues immediately to offer as an example, "in particular, the right to determine a child's place of residence." Hague Convention, art. 5, 51 Fed. Reg. at 10,498. Mr. Croll reasons that a *ne exeat* clause gives an otherwise non-custodial parent a power that amounts to a "right to determine the child's place of residence" and thereby creates a "right of custody" that is protected by the Convention's return remedy.

We disagree. The right to determine the "place of residence" is an apt example of a right of custody because it is indicative: the parent who decides where the child dwells is very likely to be the parent who exercises care and control, and therefore has custody. It is unhelpful and insufficient to think about the custodial right to designate a child's "place of residence" in terms of the power to pick her home country or territory. Such a power protects rights of custody and access alike, and is no clue as to who has custody.

Every roof is in some country, territory or jurisdiction. A child may be profoundly affected by the ambient culture and regime of a particular country, but "place of residence," *as a signal example of parental control over care and upbringing,* necessarily entails more specific choices. A custodial parent cannot discharge the responsibility of deciding a child's "place of residence" by picking a country or territory. Depending on many considerations, the custodial parent must place the child in a city, suburb, or countryside; in a particular dwelling unit at some address; at home, or in a boarding school, finishing school, military academy, or institution. These choices are unavoidable for a parent who exercises the custodial right to fix the residence of a child.

The wording of the "place of residence" example buttresses our interpretation of Article 5. The right specified is the "right to *determine*" a child's place of residence, thereby implying an active power to choose (and change) the residential address, at will, as a matter of parental and personal judgment. *See Webster's Third* at 617 (defining "determine" as "to settle or decide by choice of alternative possibilities; to direct or control the end or course of"); *Random House* at 393 (defining "determine" as "to cause, affect or control; to fix or decide causally; to settle or decide by an authoritative or conclusive decision").

The *ne exeat* clause limits Mrs. Croll's custodial power to expatriate Christina, but it does not suggest that the power to "determine" Christina's "place of residence" (in Hong Kong, New York, or anywhere else) is also Mr. Croll's. The Custody Order gives Mr. Croll a veto power only—and only over Christina's expatriation—but gives him no say over any other custodial issue, including Christina's "place of residence" *within* Hong Kong. That single veto power, even if leveraged, falls short of conferring a joint right to determine the child's residence, particularly since an earlier clause in the custody order

awards "custody care and control" *solely* to the mother.[4]

Just as important, Article 3's definition of "wrongful removal" requires that for a child's removal to be "wrongful" (and a return remedy available) the removal must be in breach of custodial rights of the petitioning parent that "were *actually exercised* ... *or* would have been so exercised *but for the removal*." Hague Convention, art. 3, 51 F. Reg. at 10,498 (emphasis added); *see also* Department of State, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10,507 (to invoke a return remedy applicants must "provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took *physical care* of the child." (emphasis added)); Pérez–Vera Report ¶ 73, at 448 (same). The right conferred by the *ne exeat* clause is not one that Mr. Croll "actually exercised," and it is circular to say that he would have exercised it *but for* Christina's removal, because the right itself concerns nothing but removal itself, and would never have been exercised had Mrs. Croll been content to stay in Hong Kong during Christina's minority.[5]

Therefore, we find the power to determine the child's place of residence, considered in context as part of a definition of custody rights, to be an example of the powers, choices and arrangements entailed by the care of the child. A *ne exeat* clause, by contrast, confers only a veto, a power in reserve, which gives the non-custodial parent no say (except by leverage) about any child-rearing issue other than the child's geographical location in the broadest sense.

If we were to enforce rights held pursuant to a *ne exeat* clause by the remedy of mandatory return, the Convention would become unworkable. A foundational assumption in the Convention is that the remedy of return will deliver the child to a custodial parent who (by definition) will receive *and care for* the child. It does not contemplate return of a child to a parent whose sole right—to visit or veto—imposes no duty to give care.

In this case, for example, the custody order places all the burdens of care and custody on Mrs. Croll, and none of them on Mr. Croll. If return were ordered, perhaps Mrs. Croll (an American citizen) would expatriate herself to the People's Republic of China in order to care for her daughter; and if she does not, Mr. Croll probably will arrange for his daughter's care. But an order of return does not require Mrs. Croll to return with Christina; the Hong Kong custody decree does not require Mr. Croll to take care of the child day-to-day; we lack discretion to withhold return of a child who has been wrongfully removed; and the Convention does not allow us to alter the custodial arrangements ordered by the court in Hong Kong. Given those mandated strictures, we cannot plausibly read the Convention to compel the removal of a child from a parent who exercises all rights of

4. The dissent calls this veto a "significant decisionmaking power" tantamount to custody, *post* at 145, but that characterization proves too much: if Mr. Croll has custody by virtue of that veto, so does the Hong Kong court. Although the Convention recognizes that an "institution or other body" may hold custody rights, nothing suggests that this child, with two living parents, is a ward of the court.

. The dissent discusses with seeming approval the view of an English court that whenever a court enters a custody order, the court itself may be taking on rights of custody. *See post*

at 150–51. That approach would of course require that every violation of the home court's decree, including expatriation in derogation solely of parental rights of access, would be deemed a violation of custody rights (of the court) and compel the child's return. Not a bad idea, perhaps, but this idea is not found in the Convention, which expressly distinguishes between custodial rights and access rights, and affords the remedy of mandatory return to enforce the former but not the latter.

5. We reach this issue—which bears on subject-matter jurisdiction—*sua sponte.*

care to a country in which no one has that affirmative power or duty.

The dissent points out that the Convention undoubtedly compels return of a child (accompanied or not by the parent who took her abroad) even (i) to a parent with joint custody who may receive the child upon repatriation at a time of year when custody would ordinarily be exercised by the parent who may remain abroad, or (ii) to a parent who exercises custody rights by decisional power without day-to-day care. *See post* at 148–49. In the first case, the child is returned to a parent who gives day-to-day care in season and who can be expected to have the facilities, resources, fitness, and inclination to give care out of season as well; in the latter case, the decision-making parent can decide in what school or in whose care the child can be placed. The dissent's analysis, however, would compel the return of the child to a parent who lacks the right or responsibility to give care or to decide who should give it, or even to a parent with access who has been found unfit to have custody.

The custodial parent who expatriates the child in violation of a court order may elect to stay abroad, if only to avoid contempt proceedings; yet the dissent construes the Convention to compel return of the child to a country in which the only parent has no duty to give care and no power except to compel the return and enjoy occasional access. The dissent offers the reassurance, however, that such a child would not be neglected because "a parent's duty to care for a child" may be imposed by "the law of the country of habitual residence." *Post* at 148. No doubt, family courts in the United States would impose that obligation as a matter of family law—though of course a court cannot confer competence or fitness—but on this point the dissent is generalizing from local American law; and even if we assume that courts anywhere can in a pinch confer custodial rights and duties on the local parent if the custodial parent remains abroad, the effect of compelling return on that assumption would be to alter custody rights rather than to enforce them.

Every textual and structural feature of the Convention suggests that a parent who furnishes no custodial care cannot establish "wrongful removal," and therefore cannot prevail on a petition to a foreign court for an order of return. Mr. Croll bears the burden of showing that the Hong Kong custody decree affirmatively granted him shared or partial custody in some normal sense of the word. That he cannot do on this record.

### C. *Intent of the Drafters*

If the stated intent of those who drafted the Convention "suffice[s] to establish that the result the text produces is not necessarily absurd, and hence cannot be dismissed as obvious drafting error," our inquiry is at an end. *Chan*, 490 U.S. at 134, 109 S.Ct. 1676; *see also id.* at 135 n. 5, 109 S.Ct. 1676 ("Even if the text were less clear, its most natural meaning could properly be contradicted only by clear drafting history."). The Convention's ratification history is entirely consistent with our interpretation of "rights of custody" as defined in the Convention.

1. The chair of the Hague Conference Commission that drafted the Convention (while allowing that the issue is not altogether clear) has written that the sole power to bar exit does not amount to the custodial bundle of rights:

> [B]reach of a right simply to give or to withhold consent to changes in a child's place of residence is not to be construed as a breach of rights of custody in the sense of Article 3. A suggestion that the definition of "abduction" should be widened to cover this case was not pursued.

A. E. Anton, *The Hague Convention on International Child Abduction*, 30 Int'l & Comp. L.Q. 537, 546 (1981). It thus appears that suggestions to broaden the availability of the return remedy—to give an "access only" parent the right to compel

return—were raised when the Convention was in draft, and were in turn rejected.

2. The official reporter of the Hague Conference recounts that "[a]lthough the problems which can arise from a breach of access rights, especially where the child is taken abroad by its custodian, were raised ... the majority view was that such situations could not be put in the same category as the wrongful removals which [the Convention] is sought to prevent." Pérez–Vera Report ¶ 65, at 444–45.

3. In submitting the Convention to President Reagan, Secretary of State George P. Schultz reported that "[t]he remedies for breach of the 'access rights' of the non-custodial parent do not include the return remedy...." Letter of Submittal of the Hague Convention on the Civil Aspects of International Child Abduction, by the Secretary of State to the President, Oct. 4, 1985, in 51 Fed.Reg. at 10,-496; see also Letter of Transmittal from the White House to the Senate, Oct. 30, 1985, in 51 Fed.Reg. at 10,495 (discussing congressional finding that "[p]ersons should not be able to obtain custody of children by virtue of this wrongful removal or retention") (emphasis added). The Secretary's view of the matter is entitled to "great weight." Sumitomo Shoji America, 457 U.S. at 184–85, 102 S.Ct. 2374. See generally El Al Israel Airlines v. Tsui Yuan Tseng, 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." (citing Sumitomo Shoji America, 457 U.S. at 184–85, 102 S.Ct. 2374)).

4. The Convention's official reporter has explained why the Convention provides separate remedies to secure access rights versus custodial rights, and limits the return remedy to the breach of custody:

A questionable result would [be] attained had the application of the Convention, by granting the same degree of protection to custody and access rights, led ultimately to the substitution of the holders of one type of right by those who held the other.

Pérez–Vera Report ¶ 65, at 445 (emphasis added).

\*     \*     \*

■ Mr. Croll asks us to draw a distinction between: (i) a bare right of access, recognized as such; and (ii) the same bare right of access enforced by a ne exeat clause. The rationale for this distinction is that a parent who removes a child in violation of access rights and a ne exeat clause would otherwise succeed in frustrating the ne exeat clause altogether, so that a return remedy is needed to achieve the Convention's goal of preventing parents from unilaterally circumventing the home country's courts in search of a more sympathetic forum. But the frustration of judicial power is not the touchstone for a return remedy under the Convention. A court order that confers a right of access (without more) on a non-custodial parent of a middle-class means is utterly frustrated if a custodial parent then permanently moves the child so far away that neither parent can afford to finance court-ordered access. Yet it is undisputed that the remedy of return is unavailable in such a case.

A ne exeat provision protects parental rights of access or custody alike; it does not transmute one right into the other. Thus, to grant the remedy of return where the petitioning parent has no right but access (whether or not that right is aided by a ne exeat clause) would effect a "substitution" of rights, something that the Convention expressly forbids. See Pérez–Vera Report ¶ 65, at 445. Overlooking the stated intentions of the drafters and amending judicially the Convention's explicit textual distinction between rights of custody and rights of access "would be to make and not construe a treaty." See Chan, 490 U.S. at 135, 109 S.Ct. 1676 (internal quotation marks omitted). That is something we cannot do. See id. ("[t]o alter, amend, or add to any treaty, by

inserting any clause, whether small or great, important or trivial would be on our part an usurpation of power, and not an exercise of judicial function." (quoting *The Amiable Isabella,* 19 U.S. (6 Wheat) 1, 71, 5 L.Ed. 191 (1821)) (alteration in original; internal quotation marks omitted)).

### D. *Foreign Caselaw*

No consensus view emerges from the opinions issued by the courts of the signatory nations. Though the "opinions of our sister signatories [are] entitled to considerable weight," *Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), we are aware of no doctrine requiring our deference to a series of conflicting cases from foreign signatories.

Foreign courts are split on the issue presented in this case. *Compare In re Resina,* (1991) Appeal No. 52 (Austl.Fam.) (violations of court orders generally trigger return); C.A. 5271/92, *Foxman v. Foxman* (Isrl.H.C.1992) (finding that both parents hold "rights of custody" where neither parent can remove the child without the other's consent or without consulting a rabbi), *with D.S. v. V.W.* [1996] 134 D.L.R.4th 481, 501–04 (Can.) (finding no jurisdiction to order return though removal was in violation of an implicit provision in the custody decree); *Thompson v. Thompson* [1994] 119 D.L.R.4th 253 (Can.) (noting that a *ne exeat* clause in a permanent custody order was intended to ensure access and "was not intended to be given the same level of protection by the Convention as custody"); *Ministere Public v. Mme Y,* T.G.I. Periguez, Mar. 17, 1992, D.S. Jur.1992(Fr.) (holding violation of a *ne exeat* provision to be "secondary" and

not a violation of custody rights). Moreover, most of the cases rest on distinguishable facts, such as (a) orders of *temporary* custody awarded in the course of an ongoing custody battle, *see B v. B,* [1992] 3 W.L.R. 865, [1993] Fam. 32 (U.K.Ct.App. 1992) (return available where no custody order is in place and temporary custody is expressly conditioned on non-removal of the child pending further proceedings), or (b) consent decrees expressly granting custody rights to both parents, *see C v. C,* [1989] 1 W.L.R. 654 (U.K.App.Ct.1988) (consent order granting "joint guardianship" to both parents).

Although the dissent claims "strong support" in caselaw for its point of view, *see post* at 151, the dissent itself confirms that no consensus is available: the cases worldwide are few, scattered, conflicting, and sometimes conclusory and unreasoned.[6] One further problem with the cases relied on by the dissent (and a problem with the dissent itself) is that in effect the rights of access are vindicated by the same remedy (compulsory return) as rights of custody; and while that seems to be a good idea as a matter of child development, it is incompatible with the terms of the Convention.

### CONCLUSION

For the reasons stated we hold that a *ne exeat* clause does not transmute access rights into rights of custody under the Convention. *Ne exeat* or not, Mr. Croll's rights include none of the powers (or burdens) of a custodial parent, and therefore are properly classified as rights of access. The Convention affords him several reme-

**6.** The lack of uniform interpretation (or application) of the Convention can be illustrated another way. The rate of return for children wrongfully removed *to* the United States from other countries is approximately 90 percent. *See* Mary A. Ryan, Assistant Sec. for Consular Affairs, U.S. Dep't of State, Prepared Statement Before the House Committee on International Relations (Oct. 14, 1999) *available in* 1999 WL 909860 (F.D.C.H.) at 3. The rate of return for American children wrongfully re-

moved *from* the United States to a foreign country, however, is less than 30 percent. *See* Thomas A. Johnson, Prepared Statement Before the House Committee on International relations (Oct. 14, 1999) *available in* 1999 WL 909869 (F.D.H.C.) at 30. *See, e.g.,* Concurrent Resolution urging compliance with the Hague Convention on the Civil Aspects of International Child Abduction, S. Con. Res. 293, 106th Cong., 146 Cong. Rec. H5089–07 (2000) (enacted).

dies for trespass on those rights, but return of the child to Hong Kong is not one of them. The district court's order returning Christina to Hong Kong is accordingly reversed and the case is remanded for dismissal of the petition for an order of return.

SOTOMAYOR, Circuit Judge, dissenting:

The central issue in this case is whether the *ne exeat* provision in the Hong Kong custody order confers on either Mr. Croll or the Hong Kong court "rights of custody" within the meaning of the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"). The majority concludes that it does not and, therefore, that the district court lacked jurisdiction to order Christina's removal to Hong Kong. Interpreting the text of the Convention in light of its object and purpose, and taking into account the relevant case law in this area, I reach the opposite conclusion. In my view, the majority seriously misconceives the legal import of the *ne exeat* clause and, in so doing, undermines the Convention's goal of "ensur[ing] that rights of custody ... under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1, *done* Oct. 25, 1980, T.I.A.S. No. 11670 at 4, 1343 U.N.T.S. 89, 98, *reprinted in* 51 Fed. Reg. 10,494, 10,498 (1986), *implemented by* the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* I therefore respectfully dissent.

The Hague Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble, 51 Fed. Reg. at 10,498. Significantly, the Convention draws a clear line between "rights of custody" and "rights of access," reserving the remedy of return solely for breaches of the former. *Compare* Hague Convention, arts. 1, 3, *id.* (providing for the return of children removed or retained in violation of custody rights), *with* Hague Convention, art. 21, *id.* at 10,500 (providing that a party may petition for arrangements, short of the child's return, to secure the effective exercise of access rights). In this regard, the majority correctly observes that "an order of return is available *only* for wrongful removals or retentions, and removals or retentions are wrongful *only* if they are 'in breach of rights of custody.'" *Ante* at 137 (quoting Hague Convention, art. 3, 51 Fed. Reg. at 10,498) (emphasis in original).

Article 3 of the Convention provides that the removal or retention of a child is "wrongful" where:

(a) it is in *breach of rights of custody* attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or *would have been so exercised but for the removal or retention.*

Hague Convention, art. 3, 51 Fed. Reg. at 10,498 (emphasis added). Thus, Mr. Croll cannot succeed in securing Christina's return to Hong Kong unless he can demonstrate that her removal was "in breach of rights of custody" and, furthermore, that at the time of Christina's removal from Hong Kong, those rights of custody "were actually exercised, either jointly or alone, or would have been so exercised but for the removal." Hague Convention, art 3, *id.* For the reasons discussed below, I conclude that Christina's removal to the United States was "wrongful" under the Convention because (1) it constituted a "breach of rights of custody" jointly held by Mr. Croll and the Hong Kong court, and (2) Mr. Croll would have exercised his custody rights under the *ne exeat* clause in

the custody order but for Christina's removal from Hong Kong.

I. Was Christina Removed from Hong Kong "in Breach of Rights of Custody"?

Under the terms of the Hong Kong custody order, Ms. Croll is vested with "[t]he custody, care and control" of Christina,[1] and Mr. Croll is vested with rights of "reasonable access." Particularly relevant to this case, however, is the order's further grant of rights to Mr. Croll under the *ne exeat* clause. The parties agree that under this provision, Ms. Croll may not remove Christina from Hong Kong without the consent of either Mr. Croll or the Hong Kong court.[2] In other words, the *ne exeat* clause confers a veto power on Mr. Croll to block Christina's international relocation, unless the Hong Kong court explicitly approves such removal. In essence, the *ne exeat* clause endows Mr. Croll with significant decisionmaking power: absent an order of the Hong Kong court to the contrary, he can require that Christina remain in Hong Kong or, alternatively, he can use his veto power as leverage to influence Ms. Croll's selection of the destination country. Because Mr. Croll may not invoke the Convention's return remedy based on his "reasonable access" rights, the issue in this case is whether he may secure Christina's return under the Convention by virtue of his rights under the *ne exeat* clause.

The majority mischaracterizes the issue as being a question of whether the *ne exeat* clause "transmute[s] access rights into rights of custody under the Convention." *Ante* at 143. Clearly, the *ne exeat* clause works no such magic. In my view, the question presented is whether the *ne*

exeat clause—wholly independent of Mr. Croll's access rights—confers "rights of custody" under the Convention. The Convention's text, object and purpose, as well as the relevant case law in this area, convincingly direct an answer in the affirmative.

A. *The Text, Object, and Purpose of the Convention*

The critical interpretive challenge in this case involves the definition of "rights of custody" as used in the Convention. The majority begins this undertaking by surveying a host of American dictionaries to support its "intuition that custody is something other and more than a negative right or veto." *Ante* at 138. Relying on these sources, the majority finds that the "custody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc., or the (revocable) selection of other people or institutions to give these things." *Ante* at 138. While traditional American notions of custody rights are certainly relevant to our interpretation of the Convention, the construction of an international treaty also requires that we look beyond parochial definitions to the broader meaning of the Convention, and assess the "ordinary meaning to be given to the terms of the treaty in their context and in the light of [the Convention's] object and purpose." Vienna Convention on the Law of Treaties, May 23, 1969, art. 31.1, 1155 U.N.T.S. 331, 340 (stating general rule on the interpretation of treaties); *see also* Restatement (Third) of Foreign Relations Law § 325 (1987) (same).

---

1. The majority states that the custody order "confers the *sole* 'custody, care and control'" upon Ms. Croll. *Ante* at 134 (emphasis added); *see also id.* at 139 (stating that "the custody order awards between custody and care and control *solely* to the mother"). However, nowhere does the Hong Kong court use the word "sole" or "solely" in connection with Ms. Croll's custody rights.

2. The Hong Kong custody order also provides that "[e]ither parent may request the Immigration Department not to issue passports allowing the said child to go abroad without his/her knowledge."

Contrary to the majority's position that "[n]othing in the Hague Convention suggests that the drafters intended anything other than this ordinary understanding of custody," *ante* at 139, the Convention and its official history reflect a notably more expansive conception of custody rights. The report containing the official history and commentary on the Convention clarifies that "the intention [of the Convention] is to protect *all* the ways in which custody of children can be exercised." Elisa Pérez–Vera, Explanatory Report to the Hague Conference on Private International Law, *in* 3 Acts and Documents of the Fourteenth Session (Child Abduction) 426, para. 71 (1980) (emphasis in original) ("Pérez–Vera Report"). This broad notion of custody rights is also consistent with Article 3, which provides that "rights of custody" may arise from a variety of sources, including by "operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of [the child's country of habitual residence]." Hague Convention, art. 3, 51 Fed. Reg. at 10,498. In this way, the Convention plainly favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." Pérez–Vera Report, para. 67. Consequently, in determining whether the rights arising under a *ne exeat* clause constitute "rights of custody" under the Convention, I discern an intent of inclusion rather than exclusion, so as to effectuate the drafters' goal of making the treaty applicable to all possible cases of wrongful removal.

Although the treaty does not generally define its legal terms, *see* Pérez–Vera Report, para. 83, the risk that "an incorrect interpretation of [custody and access rights] would ... compromis[e] the Convention's objects" led the drafters to include Article 5, which offers further guidance on the meaning of the term "rights of custody." *See* Pérez–Vera Report, para. 83. I note, however, that the provision was left deliberately vague due to the drafters' failure to agree on a more precise

definition. *See* Pérez–Vera Report, para. 84 ("[S]ince all efforts to define custody rights in regard to [particular situations] failed, one has to rest content with the general description given [in the text].""). Article 5 provides that:

For the purposes of this Convention—

(a) "rights of custody" shall include rights relating to the care of the person of the child *and, in particular, the right to determine the child's place of residence;* ...

Hague Convention, art. 5, 51 Fed. Reg. 10,498 (emphasis added); *see also* Pérez–Vera Report, para. 84 (noting that under Article 5, "rights of custody" include those rights relating to the care of the child, and that the Convention seeks to clarify this otherwise general definition "by emphasizing, as an example of the 'care' referred to, the right to determine the child's place of residence."). As I interpret the Convention, rights arising under a *ne exeat* clause include the "right to determine the child's place of residence" because the clause provides a parent with decisionmaking authority regarding a child's international relocation. Thus the *ne exeat* clause vests both Mr. Croll and the Hong Kong court with "rights of custody" for the purposes of the Convention. *See* Hague Convention, art. 5, 51 Fed. Reg. at 10,498.

A parent's *ne exeat* rights fit comfortably within the category of custody rights the Convention seeks to protect. The Convention states at its outset that its object is, along with returning children wrongfully removed from their habitual residence, "to ensure that rights of custody ... under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1, 51 Fed. Reg. at 10,498. The Pérez–Vera report explains that

the problem with which the Convention deals ... derives all of its legal importance from the possibility of individuals establishing legal and jurisdictional links [in the new country] which are more or

less artificial. In fact, resorting to this expedient, an individual can change the applicable law and obtain a judicial decision favorable to him. [Such a decision] bears a legal title sufficient to "legalize" a factual situation which none of the legal systems involved wished to see brought about.

Pérez–Vera Report, para. 15. At its core, therefore, the Convention's return remedy targets those individuals who cross international borders, presumably in search of a friendlier forum, flouting the custody law of the child's home country in the process. *See Blondin v. Dubois,* 189 F.3d 240, 245–46 (2d Cir.1999) (describing the Convention's purpose as " 'preserv[ing] the status quo and ... deter[ring] parents from crossing international boundaries in search of a more sympathetic court.' ") (quoting *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993)).

In light of the Convention's broad purpose, the concept of "wrongful removal" clearly must encompass violations of *ne exeat* rights. When a parent takes a child abroad in violation of *ne exeat* rights granted to the other parent by an order from the country of habitual residence, she nullifies that country's custody law as effectively as does the parent who kidnaps a child in violation of the rights of the parent with physical custody of that child. Moreover, where, as here, the parent seeks a custody order in the new country, she seeks to legitimize the very action—removal of the child—that the home country, through its custody order, sought to prevent. To read the Convention so narrowly as to exclude the return remedy in such a situation would allow such parents to undermine the very purpose of the Convention.

## B. *The Majority's Approach*

In reaching the opposite conclusion, the majority contends that "rights of custody," as used in the Convention, refers to a "bundle of rights" of which a parent must possess a certain portion in order to be protected by the Convention, and that possession of only one of those rights—in this case, the "right to determine the child's place of residence" by exercising and leveraging a veto power over the child's international relocation—is insufficient to confer custody on the party possessing that power. *See ante* at 138–39. In my view, however, the Convention's definition of "rights of custody" contemplates a bundle of rights that are protected regardless of whether a parent holds one, several or all such custody rights, and whether the right or rights are held singly or jointly with the other parent. In fact, the Convention expressly protects joint custody rights, *see* Hague Convention, art. 3, 51 Fed. Reg. at 10,498, which may assume a number of forms, including situations in which one parent possesses sole physical custody of the child but shares certain decisionmaking authority with the other parent. The Convention contains no indication that in such an arrangement, a parent must possess some minimum number of rights of custody in order to qualify for protection.

The majority also maintains that a parent's *ne exeat* right does not equate with Article 5's "right to determine the child's place of residence" because the latter right necessarily entails "specific choices" regarding the child's living situation rather than simply decisions regarding the country in which she lives. *See ante* at 139–40. Like the majority's definition of "custody," however, this conclusion ignores the basic international character of the Hague Convention. While such "specific choices" certainly constitute facets of custody, the broader decision as to whether a child will live in England or Cuba, Hong Kong or the United States, is precisely the kind of choice the Convention is designed to protect. *See* Pérez–Vera Report, para. 56 ("Although the Convention does not contain any provision which expressly states the international nature of the situations envisaged, such a conclusion derives as

much from its title as from its various articles.... [T]he international nature of the Convention arises out of a factual situation, that is to say the dispersal of members of a family among different countries."). The Hague Convention provides a remedy not when a parent moves the child from city to suburb or from home to boarding school, but when he or she transports the child across national borders. In light of this international context, the term "place of residence," as used in the Convention, logically contemplates decisions regarding international relocation. Accordingly, the right to choose the country in which a child lives, like the authority over the child's more specific living arrangements, constitutes a "right to determine the child's place of residence" under Article 5, and thus a "right of custody" under the Convention.[3]

The majority avoids this conclusion by asserting that the power to determine a child's country of residence "protects rights of custody and access alike, and [gives] no clue as to who has custody." *Ante* at 139. But while such a power may have the effect of ensuring a parent's reasonable access, and in fact may be included in a custody order for precisely that purpose, *ne exeat* rights circumscribe the choices of the parent with physical custody of the child in a way that "reasonable access" rights do not. Absent a *ne exeat* clause, the international relocation of a child does not necessarily violate the other

parent's access rights; the parents still may work out an arrangement that satisfies the rights of "reasonable access" even across international borders. On the other hand, when a parent expatriates her child without securing the necessary consent, she has, by definition, violated the other parent's *ne exeat* rights.

The majority also posits that the Convention would be "unworkable" if it provided the return remedy for violations of a parent's *ne exeat* rights. *See ante* at 140–41. Because an order of return can require only Christina, and not Ms. Croll, to return to Hong Kong, the majority claims that "we cannot plausibly read the Convention to compel the removal of a child from a parent who exercises all rights of care to a country in which no one has that affirmative power or duty." *Ante* at 140–41. The majority mistakenly assumes that the custody order in a given case is the sole source of a parent's rights *and duties* vis-a-vis his or her child. To the contrary, a parent's duty to care for a child, like his or her rights of custody, may arise from many sources, including the law of the country of habitual residence. That the custody order in this case granted "custody, care and control" of Christina to Ms. Croll, therefore, does not direct the conclusion that Mr. Croll will have no responsibility to care for Christina upon her return to Hong Kong.[4] I therefore reject the ma-

3. To be sure, the right to prevent a child's removal from her home country does not constitute an absolute right "to determine the child's place of residence." That a right is limited, however, does not render it meaningless for purposes of the Hague Convention. *See* Pérez–Vera Report, para. 71 (characterizing "joint custody" as "dividing the responsibilities inherent in custody rights between both parents"). Furthermore, that a right is a veto or "negative right" does not diminish its status as a right. *See, e.g., Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 281, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (recognizing the due process right to *refuse* life-sustaining medical treatment).

4. The majority faults the dissent for its "assumption" that a court will "alter custody

rights" upon the child's return, and raises fears that absent such alteration, the child will be uncared for upon her return to Hong Kong. *See ante* at 141. Christina's care upon her return is neither premised on assumptions nor relevant to the issue before us. First, it strains credulity to suggest that a father who, as here, searches the world for his child to get her back and files a petition in a foreign forum in order to do so, would, upon succeeding in his efforts, simply permit his child to stand abandoned in the airport upon her return. The majority confuses physical care of a child with legally-ordered custody. Furthermore, if Christina's care upon her return to Hong Kong were really a concern in the instant case, the appropriate remedy would not be reversal but a remand to the district court to assess the parties' intentions.

jority's dire forecast that ordering Christina's return, without Ms. Croll at her side, risks leaving Christina helpless in Hong Kong without parental care.

Moreover, the majority's characterization of a return remedy for violations of *ne exeat* rights as unworkable fails to account for the Convention's protection of any number of joint custody arrangements in which the parents trade physical custody or in which one parent possesses physical custody and the other parent contributes to decisions about the child's upbringing. By the majority's reasoning, were the parent with physical custody to remove the child from the country of habitual residence, the court would have no power to return the child, because no adult would be required to care for him or her upon return. Such a conclusion, however, would largely eviscerate the Convention's protection of joint custody rights.

See *Feder v. Evans–Feder*, 63 F.3d 217, 226 (3d Cir.1995) ("[I]n order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent."); *In re Walsh*, 31 F.Supp.2d 200, 207 (D.Mass.1998) ("Numerous courts granting petitions under the Convention have recognized the legitimacy of exacting appropriate undertakings from the parents designed to ensure that the children will be cared for properly during transit and that no harm will come to the children pending disposition in the country of habitual residence.") (citations omitted), *aff'd in part, rev'd in part on other grounds sub nom. Walsh v. Walsh*, 221 F.3d 204 (1st Cir.2000). Second, the issues concerning Christina's custody upon her return are beyond the scope of the Convention, which deals solely with returning a child to the country of habitual residence so that its courts, and not a foreign court in the country to which the child has been wrongfully removed, can adjudicate custody rights with respect to that child. This concept underlying the Convention—that the child is best served by entrusting decisions regarding his or her custody to the courts of the child's country of habitual residence—stands in direct contradiction to the majority's parochial view that foreign courts cannot be trusted in the same manner as American courts to competently make necessary decisions regarding the child. *See ante* at 141 ("on this point the dissent is generalizing from local American law").

Far from being unworkable, the application of the return remedy in the context of *ne exeat* violations directly and fully advances the Convention's goal of preventing parents from unilaterally circumventing the home country's custody law. In contrast to access right violation cases where returning the child to her country of habitual residence would not itself guarantee the effective exercise of such rights, ordering the return of a child based on a *ne exeat* violation will, in and of itself, give full effect to a parent's *ne exeat* rights.

Finally, the majority cites to a string of authorities under the caption "Intent of the Drafters" to support its narrow reading of the Convention. *See ante* at 141–43. With one exception, these authorities stand only for the unremarkable proposition that under the Convention, the return remedy is unavailable for breaches of parents' access rights.[5] In sum, those authorities

5. The majority quotes A.E. Anton, the former chairman of the Hague Conference Commission, who opines that "breach of a right simply to give or to withhold consent to changes in a child's place of residence is not to be construed as a breach of rights of custody in the sense of Article 3." *Ante* at 141 (quoting A.E. Anton, *The Hague Convention on International Child* Abduction, 30 Int'l & Comp. L.Q. 537, 546 (1981)). Although Mr. Anton's views support the majority's interpretation of the Convention, the majority neglects to emphasize that his article represents only his personal views and not the official legislative history of the Convention. *See* Anton, *supra* at 537 ("This paper, however, must not be taken to reflect any views other than those of the author."). His article is therefore appropriately viewed as simply the opinion of one scholar. Other scholars, in contrast, have concluded that *ne exeat* rights do constitute "rights of custody" under the Convention. *See, e.g.*, Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 72–73 (1999) ("If an individual is a child's sole custodian there are, prima facie, no restrictions on him relocating with that child. If there *are* such restrictions, that implies that the custody right must in some way be limited. Where this is so it must be that another body or individual holds a corresponding right in relation to the child. Therefore, should the primary carer remove the child abroad, ... he would have breached the custody rights of the other party, if their

shed no light on the issue relevant here, i.e., whether *ne exeat* rights constitute "rights of custody" for the purposes of the Convention.

### C. *International Case Law*

While not essential to my conclusion that *ne exeat* rights constitute "rights of custody" under the Convention, I note that my analysis is consistent with the decisions of most foreign courts to consider the issue. *See generally Air France v. Saks*, 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (in construing the terms of a treaty, "the opinions of our sister signatories [are] entitled to considerable weight.") (quoting *Benjamins v. British European Airways*, 572 F.2d 913, 919 (2d Cir.1978)). Given the desirability of uniformity in treaty interpretation, *see Denby v. Seaboard World Airlines, Inc.*, 737 F.2d 172, 176 n. 5 (2d Cir.1984), these cases lend support to my understanding of the Convention.

Most foreign courts addressing this question have interpreted the notion of "rights of custody" broadly in light of the Convention's purpose and structure. The Family Court of Australia, for example, has characterized the "spirit of the Convention" as ensuring "that children who are taken from one country to another wrongfully, in the sense of in breach of court orders or understood legal rights, are promptly returned to their country so that their future can properly be determined within that society." *In the Marriage of: Jose Garcia Resina Appellant/Husband and Muriel Ghislaine Henriette Resina Respondent/Wife*, Appeal No. 52, 1991 (Fam.) (Austl.), para. 26. Accordingly, the court held that the custody order at issue—which provided reciprocal *ne exeat* rights for each parent—created "rights of custody" in the otherwise non-custodial father.

The English Court of Appeal has employed a similarly broad reading of the Convention, holding that Article 5 "may in certain circumstances extend the concept of custody beyond the ordinarily understood domestic approach" so as to ensure "that within its scope [the Convention] is to be effective." *C. v. C.*, [1989] 1 W.L.R. 654, 658 (C.A.) (Eng.). In *C. v. C.*, the court ordered the return of a child where an Australian order granted custody to the child's mother, but also provided that the father and mother would remain "joint guardians" and that neither parent could remove the child from Australia without the consent of the other. *See id.* at 656. Interpreting the language of Article 5, the court found that because the Australian custody order allowed the father to exercise a measure of control over the child's place of residence, the father possessed "custody rights" within the meaning of the Convention:[6]

> [T]he father had, in my judgment, the right to determine that the child should reside in Australia or outside the jurisdiction at the request of the mother....

consent had not been sought.") (emphasis in original); Linda Silberman, "Custody Orders Under the Hague Abduction Convention," *in A New Vision for a Non–Violent World: Justice for Each Child* (Proceedings of the 4th Biennial International Conference of the International Association of Women Judges, 1999), at 236 (arguing that in cases of non-removal order violations, "a failure to recognize the Convention remedy of return would be inconsistent with the careful compromise [between custody and access rights] that the Convention definition [of custody rights] has put in place.").

**6.** The majority attempts to distinguish *C. v. C.* as involving an order of joint guardianship,

*see ante* at 143, but the *C. v. C.* court explicitly relied on the language of the *ne exeat* provision and not the joint guardianship clause in determining that the father possessed "rights of custody" under the Convention. *See* [1989] 1 W.L.R. at 657–58 ("[The lower court judge] heard argument as to the effect of ... joint guardianship.... [Accordingly, t]he judge's attention does not appear to have been sufficiently drawn to the effect on the definition in article 5 of the Convention of clause 2 of the November 1986 order, that neither parent should remove the child from Australia without the consent of the other.").

[He has] some control over not only the child leaving the jurisdiction, but also as a place to which the child was going, and not only the country; for instance, to live in London under suitable circumstances.... The father does not have the right to determine the child's place of residence within Australia but has the right to ensure that the child remains in Australia or lives anywhere outside Australia only with his approval.

*Id.* at 658. The Israeli High Court of Justice, when presented with facts nearly identical to those in the instant case, similarly interpreted "rights of custody" to encompass a parent's rights under a non-removal order. *See C.A. 5271/92, Foxman v. Foxman* (H.C.1992) (Isr.) (finding that the Convention's definition of "custodial rights" should be "broadly construed," so as to cover cases in which parental consent is required before a child is taken out of the country); *cf. C.A. 1648/92, Tourna v. Meshulem* (H.C.1992) (Isr.) (finding "rights of custody" in a father who, by virtue of a joint custody order, had authority to refuse consent to the child's change in residence).

In addition to these cases, which address custody rights held by a *parent* with *ne exeat* rights, the English Court of Appeal has also held that a *court* entering the custody order in the child's place of habitual residence may itself possess "rights of custody" under the Convention in certain circumstances. *See B. v. B.,* [1993] 2 All E.R. 144 (C.A.) (Eng.). The court in *B. v.*

*B.* noted that under Article 3 an "institution or other body" as well as an individual may hold custody rights and thus concluded that the removal of the child by the parent with physical custody in breach of an interim custody order conditioned on the child remaining within the jurisdiction violated the rights of both the other parent and the court issuing the interim custody decree. *See id.* at 148–49. Echoing the reasoning of *C v. C,* the court found that because the restriction required the parent with physical custody to remain in the court's jurisdiction, and thus impliedly gave the court and the parent without physical custody the right to veto an international move, it vested both with the power to determine the child's residence. *See id.* at 148–49. The court therefore affirmed the order of return on the ground that the child's removal had been wrongful within the meaning of the Convention. *See id.* at 153.[7]

These cases reflect strong support among our sister signatories for the proposition that "rights of custody" are implicated where a custody order vests either a parent or the court with the power to block a parent with physical custody from deciding to expatriate her child.[8] While there are several cases in other jurisdictions that are certainly in tension with this view, I find the reasoning in those cases unpersuasive.

At least one French court has determined that a custody order requiring the

---

7. It is not apparent to me how the majority turns this case—involving a veto power over international relocation possessed by a court and a parent—into a decision that requires return of the child "whenever a court enters a custody order" that is violated, regardless of the terms of that order. *See ante* at 139–41. This dissent has never suggested that Mr. Croll or the court would be entitled to an order of return if they did not possess *ne exeat* rights, nor does *B v. B* or this dissent suggest that return would be required in the scenario posed by the majority of "expatriation in derogation solely of parental rights of access." *See ante* at 139–40.

8. Although the majority states that "we and the district court are the only courts in the United States," *ante* at 136, to consider the issue before us, I note that two American courts have also recognized "rights of custody" in connection with custody orders containing a *ne exeat* clause. *See David S. v. Zamira S.,* 151 Misc.2d 630, 574 N.Y.S.2d 429 (N.Y.Fam.Ct.1991); *Janakakis–Kostun v. Janakakis,* 6 S.W.3d 843 (Ky.Ct.App.1999), *review denied* (Dec. 9, 1999), *cert. denied,* — U.S. ——, 121 S.Ct. 32, — L.Ed.2d — (2000). In my view, however, these cases are of limited utility because they fail precisely to

mother to raise her children in England and Wales did not create custodial rights in the father because such a reading would infringe on the mother's right to expatriate. *See* T.G.I. Periguex, Mar. 17, 1992, *Ministere Public v. Mme. Y.,* D.S. Jur. 1992 (Fr.). However, the court in *Mme. Y.* did not address the meaning of Article 5's "right to determine the child's place of residence" provision and instead focused on the mother's expatriation rights under the European Convention for the Protection of Human Rights and Fundamental Freedoms. *See id.* at 315–16. But deciding a Hague Convention case on the ground that the custodial parent must remain free to expatriate her child begs the crucial interpretive question of who, for purposes of the Convention, are "custodial parents" in the first place. Nothing in the Convention suggests that one parent's right to expatriate overrides another parent's rights of custody. On the contrary, the paramount importance the Convention places on custodial rights suggests that where custodial rights and expatriation rights conflict, the latter must yield to the former. To adopt another reading would, among other difficulties, make the Convention's protection of joint custody impossible, as joint custody by its very nature limits each parent's unilateral decision-making power, including his or her power to relocate to another country with the child. In my view, therefore, the legal presumption against restrictions on expatriation answers little.[9]

Apart from the *Mme. Y.* decision, two other cases are in tension with the proposition that *ne exeat* rights constitute "rights of custody" under the Convention. In two separate decisions, the Canadian Supreme Court has suggested—in *dicta*—that the Convention's "wrongful removal" provision does not cover cases in which a parent acts in violation of an express provision in a custody order granting *ne exeat* rights. In the first, *Thomson v. Thomson,* [1994] 119

D.L.R. 4th 253 (Can.), the court ordered a child's return based on an interim non-removal order in order to "preserve jurisdiction in the Scottish court to decide the issue of custody on its merits in a full hearing at a later date," but noted in *dicta* that such a remedy would be unavailable for violation of a *final* non-removal order because the purpose of such an order was simply to "ensure permanent access to the non-custodial parent." *Id.* at 281. In the second case, *D.S. v. V.W.* [1996] 134 D.L.R. 4th 481 (Can.), the court held that a return remedy was not available under the Convention for violation of an implicit removal restriction in a custody order, and—relying in part on the *dicta* in *Thomson* relating to express provisions in permanent custody orders—stated that a violation of such an implicit restriction would concern only access rights, not custodial rights. *Id.* at 501–06. However, the court nevertheless ultimately upheld the lower court's order of return on the alternate ground that such return was in the best interests of the child under Quebec domestic legislation. *Id.* at 516–17.

For the reasons explained above, *supra* I.A., I am unpersuaded by the argument that *ne exeat* clauses in permanent non-removal orders relate solely to access rights, the view endorsed by the Canadian Supreme Court. Nor do I consider significant the Canadian Supreme Court's emphasis on the distinction between interim and permanent custody orders. To be sure, a court issuing an interim custody order has a strong interest in preventing a child's removal before it has the opportunity to make its final custody determination. But nothing in the Convention's language or official history supports the notion that this interest is any more important than the court's interest in enforcing the final custody order once issued. The dichotomy between an interim and permanent custody order is, therefore, for the purposes of

---

define "custodial rights" or to differentiate them from access rights.

**9.** I also note that courts in France appear divided on this issue. *See* Martha Bailey,

*"Rights of Custody" Under the Hague Convention,* 11 B.Y.U. J. Pub.L. 33, 40 (1997) (discussing French cases).

the Convention, a distinction without a difference.

I note also that while the *D.S.* decision to uphold the order of return was unanimous, six (out of nine) justices expressed reservations regarding the opinion's analysis of custodial rights and obligations, *see* 134 D.L.R. 4th at 484, 518; *see also* Bailey, *supra,* at 49, thereby raising serious doubts as to whether the opinion's conception of *ne exeat* clauses in relation to the Convention truly represents the rule in Canada. Scholars have also strongly criticized the Canadian interpretation of custody rights under the Convention. *See, e.g.,* Bailey, *supra,* at 42–50; Linda Silberman, "Custody Orders Under the Hague Abduction Convention," *in A New Vision for a Non–Violent World: Justice for Each Child* (Proceedings of the 4th Biennial International Conference of the International Association of Women Judges, 1999), at 235–240. Therefore, following what I consider to be the more compelling reasoning of the English, Australian, and Israeli cases, I would join the courts of those countries in finding that rights arising under a *ne exeat* clause constitute "rights of custody" for the purposes of the Hague Convention.

## II. Did Mr. Croll Or The Hong Kong Court "Actually Exercise" *Ne Exeat* Rights?

Apart from the central issue of whether *ne exeat* rights constitute "rights of custody" under the Convention, the majority also holds that Mr. Croll's petition fails to satisfy the requirement of Article 3(b) of the Convention, which provides:

The removal or retention of a child is to be considered wrongful where . . . at the time of removal or retention those rights [of custody] were actually exercised, either jointly or alone, *or would have been so exercised but for the removal or retention.*

Hague Convention, art. 3(b), 51 Fed.Reg. at 10,498 (emphasis added). According to the majority, "[t]he right conferred by the *ne exeat* clause is not one that Mr. Croll 'actually exercised,' and it is circular to say that he would have exercised it *but for* Christina's removal, because the right itself concerns nothing but removal itself, and would never have been exercised had Mrs. Croll been content to stay in Hong Kong during Christina's minority." *Ante* at 140 (emphasis in original).[10] This description mischaracterizes the right that a *ne exeat* clause creates.

The right given to Mr. Croll and the Hong Kong court by the *ne exeat* clause was the authority to withhold or grant consent to removing Christina from Hong Kong. Had they refused to grant Ms. Croll permission to take Christina to the United States, or even had they agreed to grant permission, they would have "actually exercised" the custody rights granted by the custody order. While I agree that neither Mr. Croll nor the court did, in fact, "actually exercise" this right, it seems clear to me that Ms. Croll's conduct in removing Christina without the necessary consent was precisely what prevented them from doing so. Because Ms. Croll deprived Mr. Croll and the court of the opportunity to exercise their veto power by surreptitiously removing Christina from Hong Kong without first seeking consent, the *ne exeat* right is one that "would have been so exercised" but for Christina's unlawful removal. Article 3(b) therefore poses no barrier to finding that Christina's removal was wrongful under the Convention.

For the foregoing reasons, I conclude that Christina's removal from Hong Kong to the United States was "wrongful" under the Convention because her removal (1) constituted a "breach of rights of custody" jointly held by Mr. Croll and the Hong Kong court, and (2) Mr. Croll or the court—or both—would have exercised their veto rights under the *ne exeat* clause

10. Ms. Croll does not argue on appeal that Mr. Croll's petition was defective under Article 3(b) of the Convention. The majority reaches this issue *sua sponte.*

but for Christina's removal from Hong Kong. Accordingly, I would affirm the district court's decision to grant Mr. Croll's petition for an order of return.