GABOR VIRAGH vs. MARIA FOLDES[1] & another.[2]

Norfolk. February 2, 1993. - April 29, 1993.

Present: LIACOS, C.J., NOLAN, O'CONNOR, & GREANEY, JJ.

*Hague Convention on the Civil Aspects of International Child Abduction. International Child Abduction Remedies Act. Minor, Visitation rights. Parent and Child, Custody. Divorce and Separation, Child custody, Attorney's fees. Words, "Rights of custody," "Rights of access."*

In an action by the father of two children pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Convention), against the mother, who had been granted sole custody of the children by a Hungarian court in connection with their parents' divorce and had traveled to Massachusetts with the children, in which the father sought the immediate return of the children to Hungary, a Probate Court judge correctly concluded that the Convention did not mandate that the children be returned to their habitual residence in Hungary for the father to exercise his visitation rights. [103-109]

In an action pursuant to the Hague Convention on the Civil Aspects of International Child Abduction in which the father of two children sought their return to Hungary at least twice a year, at their mother's expense, during their stay in Massachusetts with the mother, who had been granted sole custody of the children by a Hungarian court in connection with their parents' divorce, the Probate Court, on remand, was to order the parties to submit evidence from which the judge could determine an appropriate visitation order that recognized the costs associated with visitation as well as the financial limitations of the parties, and the judge was to consider the father's request for a longer visitation period when determining the practical limits of visitation and also his request for telephone contact with the children. [109-111]

There was no merit to the contention of a party who successfully petitioned for rights of access to his children under the Hague Convention on the Civil Aspects of International Child Abduction (Convention)

_____

[1] In his "verified" complaint, the plaintiff referred to the defendant Maria Foldes as "Maria Viragh" and never stated that they had been divorced.

[2] Mihaly Gereb. The plaintiff amended his complaint to add Maria's husband as a defendant.

that he was entitled to attorney's fees, where neither the Convention nor the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601-11610, mandated the award of costs or fees to a party who successfully petitions for rights of access. [111]

CIVIL ACTION commenced in the Norfolk Division of the Probate and Family Court Department on May 23, 1991.

The case was heard by *David H. Kopelman*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Gerald L. Nissenbaum* for the plaintiff.

*Mihaly Gereb*, pro se.

*Maria Foldes*, pro se, was present but did not argue.

The following submitted briefs for amici curiae:

*Dr. Katalin Benedek* of the Republic of Hungary, for the Republic of Hungary.

*Sanford S. Dranoff & Paula S. Seider* of New York, for U.S.A. Chapter of the International Academy of Matrimonial Lawyers.

GREANEY, J. The plaintiff father, Gabor Viragh (Gabor), brought this action pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Convention) in the Probate and Family Court Department in May, 1991, seeking the immediate return of his two sons to his custody in Hungary.[3] In the alternative, Gabor requested that the defendant mother, Maria Foldes (Maria), be ordered to send the children to Hungary at least twice a year, at her expense, during their stay in the United States. Maria, who was granted sole custody of the children by the Central District

---

[3]The Convention was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." 51 Fed. Reg. 10,498 (1986). The United States and Hungary are signatories to the Convention. The enabling legislation giving force to the Convention was enacted in 1988 as the International Child Abduction Remedies Act (ICARA), Pub. L. No. 100-300, § 1, 102 Stat. 437 (1988) (codified at 42 U.S.C. §§ 11601-11610).

Court of Budapest in connection with her divorce from Gabor in 1986, came to the United States with the children in November, 1990.

An evidentiary hearing on the matter was held in July, 1991, at which Gabor was not present but was represented by counsel, and a judgment was entered on October 4, 1991. The Probate Court judge concluded that the Convention does not mandate that children be returned to their habitual residence for the purpose of visitation. The judge specifically found that there exists a substantial risk that Gabor will not return the children to Maria's custody if they are sent to Hungary and ordered that Gabor exercise his visitation rights twice a year in the United States. Maria was ordered to reimburse Gabor for his reasonable travel expenses. Gabor appeals from this ruling arguing that the judge improperly construed the Convention and Hungarian law. We granted Gabor's application for direct appellate review. We conclude that the judge properly interpreted the Convention. Although the judge did not issue any interpretation of Hungarian law, we conclude that a ruling of the Hungarian court on this matter, issued subsequent to the judgment now before us, supports the judge's application of the Convention to this case.

The facts are as follows. Gabor and Maria were married in Budapest, Hungary, in 1983, and divorced there in 1986. Their son Robert was born in 1983, and another son, Attila, was born in 1985. At the time of divorce, Gabor opposed the grant of custody to Maria and appealed from the order of the Central District Court of Budapest. This appeal was denied on several grounds including that the best interests of the children would be served by Maria's having custody of them and that Gabor had demonstrated his lack of cooperation since the divorce by keeping Robert three weeks beyond the expiration of his summer visitation period. Gabor remarried in November, 1987, and lives in Budapest with his second wife and their two year old child.

In Hungary, custody issues are decided by the courts while specifics of visitation matters are determined by an adminis-

trative system, referred to as the Guardianship Authority. The visitation order presently in effect was issued by the Budapest Guardianship Authority in November, 1989, and grants Gabor visitation on alternate weekends, two weeks each in July and August, and three days during the children's winter and spring holidays. Gabor filed a subsequent request for additional visitation which was denied by the Guardianship Authority. Since the divorce, Gabor has filed approximately fifty complaints and appeals against Maria in different Hungarian courts and before various executive authorities, all of which have ultimately been dismissed.

In June, 1990, Maria informed Gabor that she was traveling to the United States for a three-week period. During her visit, she married Mihaly Gereb (Mihaly), a dual citizen of the United States and Hungary, and became pregnant with Mihaly's child. On her return to Hungary, Maria petitioned for a visa for immediate entry into the United States as the wife of a United States citizen and made arrangements to bring her two children to live with her and her second husband. Mihaly, an assistant professor at Tufts University, had a two-year appointment which was scheduled to expire on August 31, 1991. Maria intended to stay in the United States until June, 1991, the end of Mihaly's required attendance at Tufts. Despite her intention to remain for less than one year, Maria obtained a "green card" to permit her to work while in the United States and an unpaid leave of absence from her job in Hungary until December, 1991.

On November 11, 1990, Maria, who was more than five months pregnant, and the two children left Hungary using one-way airline tickets purchased by Mihaly. On their arrival, their passports were stamped in a manner which indicates that they may lawfully remain as permanent residents. Maria did not inform Gabor of her plans prior to leaving, but sent him a letter the day she left in which she explained that she was returning to the United States. She furnished Gabor with her new address so that he could write to the children and stated that routine visitation would have to be suspended during their absence. Maria indicated, however, that she was

willing to work out a mutually acceptable schedule for visitation and suggested that Gabor make contact with her Hungarian attorney for further information. Although she had experienced great difficulties with Gabor, Maria did not intend to deprive him of contact with the children. Her sole reason for leaving Hungary was to live with Mihaly.

The decision not to inform Gabor of her plans prior to leaving Hungary was based on several concerns. Gabor had not been a model husband. He physically abused and verbally threatened Maria on a number of occasions both prior to and following the divorce,[4] one time attacking her when she was seven months pregnant with their second child. At the time Maria requested the divorce, Gabor was so distressed that he threatened to kill himself and the two children and also told Maria that, if she continued with her divorce action, she would never see the children again. Maria feared that Gabor would physically abuse her if he knew that she was leaving Hungary. She also believed, based on the numerous complaints he previously had filed against her, that Gabor would file a law suit or petition for custody thus forcing her to remain in Hungary to appear and answer new allegations. It was Maria's understanding that she would not be permitted to fly overseas during her last three months of pregnancy and, therefore, any potential litigation in Hungary would result in her separation from Mihaly until after the birth of their child. The judge found that Maria's fears, and thus her reasons for not informing Gabor prior to her departure, were reasonable.

Shortly after their arrival in the United States, Maria sent a second letter to Gabor informing him that she and the chil-

---

[4]For example, in September, 1987, Gabor slapped Maria causing her face to be bruised. Because of this incident and the fact that Gabor did not return Robert until three weeks after his visitation period had expired, Gabor was fined and his visitation rights were suspended for six months. Within six months of that attack, Gabor approached Maria in a threatening manner and struck her father when he intervened to protect her. As a result, Gabor was placed on probation for one year by a criminal court in Budapest. Gabor was also permanently restrained from entering Maria's residence.

dren had moved to a different address. She also described the children's progress in their new school and wished Gabor a Merry Christmas on behalf of herself and the children. Although Gabor stated in his verified complaint that he has "yet to receive a reply to any of his weekly letters to the children," and that he has "had no information about the children" except for the two letters sent in November, 1990, the judge found these statements to be false. In fact, Maria has encouraged and fostered contact between Gabor and the children since leaving Hungary. She has written to Gabor on a monthly basis, enclosing letters and drawings from the children. She also sent a package in March, 1991, with pictures of the children and samples of their schoolwork. Gabor, in his letters to the children, has acknowledged receipt of their letters and has thanked them for writing. The children are provided with all letters received from Gabor.

The financial resources of both Gabor and Maria appear to be quite limited. Gabor was trained as a psychologist, but officially works only four hours a day as a physical education teacher in a public school (earning a salary of less than $120 a month). A mandatory 32% of Gabor's monthly salary is automatically deducted for child support. It is Maria's belief, however, that Gabor earns income from unofficial work from which he does not pay child support. Maria, who earned approximately $260 per month working as an arbitrage dealer in the foreign exchange department of the Commercial and Credit Bank of Hungary, has not earned any income since arriving in the United States and does not have any assets or savings, other than an account in Hungary into which child support payments are deposited. She has attempted to start a business with Mihaly; however, this endeavor has not produced income. Mihaly, whose salary at Tufts is $49,000 a year, supports Maria, the two children from her first marriage, and the couple's baby. Shortly before the July, 1991, hearing, Mihaly learned that his appointment at Tufts had been extended for two years. Maria now intends to stay in the United States with Mihaly and the three children at least until August, 1993.

According to Maria, Gabor did not make contact with her Hungarian attorney to discuss the matter of visitation but instead instituted formal proceedings under the Convention to enforce his access rights.[5] In February, 1991, the Hungarian Ministry of Justice, as the designated Hungarian central authority to the Convention, sent a document on behalf of Gabor to the United States Department of State, requesting access rights (visitation) in accordance with the Convention. The standardized document, which was designed for the purpose of requesting the return of children wrongfully removed or retained from Hungary, had been altered throughout to make clear that only access rights, and not return of the children, were being requested. It appears that the present action was instituted in connection with that request.

In addition to this action in the Probate and Family Court, Gabor sought relief in Hungary by petitioning for modification of the order which had granted Maria custody of the children. This petition was based on Gabor's assertion that Maria prevents him from maintaining relations with the children and the fact that Maria removed the children from Hungary without his consent. The Central District Court of Budapest denied Gabor's petition in a written decision issued on March 11, 1992.[6] The decision specifically referred to the October 4, 1991, judgment of the Probate and Family Court. Although the Hungarian court noted that visitation twice a year in the United States will place a considerable financial burden on Gabor, the court recognized that Maria must reimburse Gabor for his expenses. The Hungarian court found

---

[5]Maria stated in her motion to dismiss that, prior to the present action, Gabor had never directly requested that the children be sent to Hungary for visitation. She also stated that Gabor has refused to negotiate with her concerning visitation and, therefore, she fears that he will abduct the children if they are sent. Despite this fear, Maria offered to send the children to Hungary once a year, at Mihaly's expense, provided that Gabor post a bond with her attorney in Hungary to assure the children's timely return. The record indicates that Gabor is not willing to accept the conditions of this offer.

[6]Gabor apparently appealed from this decision; however, the record does not include the result of that appeal, if any has been issued.

that removal of the children from Maria, with whom they have always lived, will cause them greater psychological harm than that caused by limited visitation and contact with Gabor. For this reason, as well as the fact that Maria and Mihaly provide the children with a suitable home, the court denied Gabor's petition. The decision of the Hungarian court did not in any way challenge the findings, judgment, or order of the Probate and Family Court.

1. *Mandatory return of children under the Convention.* At the July, 1991, hearing, it was clear that this case concerned only one issue, Gabor's access rights under the Convention. There was no question that Maria had been granted sole custody of the children by the Hungarian court and that Gabor had expressly been granted visitation rights, but not joint custody rights. The central argument presented by counsel for Gabor was that Maria had violated Gabor's access rights by leaving Hungary without receiving permission from either Gabor or the Guardianship Authority. Although he conceded that Maria could legally travel abroad with the children, counsel further argued that Maria now intends permanently to remain with the children in the United States. According to counsel, Hungarian law requires that the custodial parent receive permission from either the noncustodial parent or the court before children are permanently removed from Hungary. Because Maria did not receive this permission, counsel argued that Maria's retention of the children in the United States constitutes "wrongful retention" within the meaning of art. 3 of the Convention.

At the time of the hearing, less than eight months had passed since Maria left Hungary. The judge made no finding regarding Maria's intention permanently to remain in the United States, but specifically found that she did not intend permanently to remain here when she left Hungary in November, 1990. In response to the assertion by Gabor's counsel that her retention of the children in the United States is wrongful, Maria declared that she does not wish to keep the children here beyond the period permitted by Hungarian law. Maria explained that Hungarian law permits a custodial par-

ent to take children abroad without permission from either the noncustodial parent or the Guardianship Authority, at least for a period of one year. The judge, therefore, focused on the only issue then properly before him, Gabor's access rights under the Convention.

The judge correctly concluded that the Convention does not mandate the return of children to the noncustodial parent for the purpose of visitation. The Convention distinguishes between "rights of custody" and "rights of access," and mandates return only when children have been removed or retained in breach of rights of custody attributed to a person, institution or other body. Art. 3.[7] Art. 12. See *Meredith* v. *Meredith*, 759 F. Supp. 1432, 1434 (D. Ariz. 1991) (party seeking mandatory return must satisfy threshold requirement of proving lawful rights of custody at the time of removal or retention). Rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Art. 5 (a). Rights of access "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Art. 5 (b). When a child has been removed or retained in breach of rights of custody, and no exceptions set forth in art. 13 have been established,[8] the Convention man-

---

[7]Article 3 of the Convention provides:

"The removal or the retention of a child is to be considered wrongful where —

"(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

"(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

"The rights of custody mentioned in sub-paragraph (a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."

[8]Article 13 provides in relevant part: "Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that —

dates that the nation to which the child has been taken order the return of the child to its habitual residence "forthwith." Art. 12. See *Sheikh* v. *Cahill*, 145 Misc. 2d 171, 176 (N.Y. Sup. Ct. 1989). In contrast, the Convention does not mandate any specific remedy when a noncustodial parent has established interference with rights of access.[9] Rather, nations are instructed in art. 21 to "promote the peaceful enjoyment of access rights and the fulfillment of any conditions to which the exercise of those rights may be subject," as well as to "take steps to remove, as far as possible, all obstacles to the exercise of such rights." [10,11]

---

"(a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

"(b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

[9]When addressing access rights, the Convention speaks in terms of "securing the effective exercise of rights of access." Chap. IV, art. 21. The judge found that Maria did not violate Gabor's rights of access because she did not prevent him from exercising his visitation rights in the United States. The judge further recognized that the visitation order issued by the Guardianship Authority did not expressly state that visitation must be exercised in Budapest. It is obvious that the childrens' presence in the United States makes practically impossible the exercise of the precise visitation schedule ordered by the Guardianship Authority. That, however, does not mean that Gabor is prevented from effectively exercising his access rights to the children in the United States.

[10]Under art. 18, a judge is granted the discretion to order that children be returned to their habitual residence for the purpose of visitation. The Convention, however, clearly distinguishes between mandatory return due to wrongful removal or retention under art. 3, and discretionary return under art. 18. Gabor argues that the judge should have ordered that the children be returned to Hungary for visitation because Maria did not prove by clear and convincing evidence that any art. 13 (b) exceptions apply to this case. See 42 U.S.C. § 11603 (e) (2) (A). Gabor's argument is misplaced. Art. 13 (b) exceptions apply only to cases of mandatory return, not discretionary return for visitation.

[11]We reject Gabor's argument that the judge erred by not formally requesting a determination from the Hungarian authorities concerning the wrongfulness of the children's removal or retention under Hungarian law. Article 15 provides that the judicial authorities of a contracting nation have the discretion to request such a determination in a case where a party

In his appeal, Gabor does not argue that the Convention mandates the return of children for the exercise of access rights by the noncustodial parent. Rather, he argues that the term "rights of custody" is broadly defined under the Convention and that he has rights of custody under Hungarian law which have been violated by the wrongful retention of his children in the United States.[12] Article 3 provides that determination whether the party who has requested mandatory return is indeed vested with rights of custody should be based on the "law of the State in which the child was habitually resident immediately before the removal or retention." To support his claim that he has rights of custody, Gabor points to certain provisions of the family law of Hungary, as well as to a recent ruling issued by the Civil College of the Supreme Court of Hungary, referred to as Ruling 284. This ruling was issued in December, 1991, after the judgment in this case, but before the ruling by the Central District Court of Budapest which denied Gabor's petition for modification of custody. It appears that Ruling 284 applies the family law of

has claimed that the removal or retention of children was wrongful within the meaning of art. 3. The judge properly exercised his discretion in not requesting an art. 15 determination from Hungary because the judge was deciding the issue of access rights, not mandatory return of the children.

[12]Gabor also raises several objections to the judge's conduct of the hearing. Gabor contends that the judge improperly decided the case prior to the hearing by declaring at the outset that he would not return the children to Hungary. It is apparent from the transcript that the judge, after learning that Maria, and not Gabor, had been awarded custody by the Hungarian court, and after learning that the Convention mandates return only when the person with custody rights requests return, was simply stating that the Convention's mandatory return provisions do not apply to requests for visitation. Gabor further claims that the judge improperly acted as an advocate for Maria. There is no merit to this claim. The transcript reveals that the judge was not biased toward either party, and that his questioning of Maria, and his decision to allow Maria, who did have a fluent command of English, broadly to answer questions, were justified and reasonable in the circumstances. See *Adoption of Seth*, 29 Mass. App. Ct. 343, 351 (1990). Finally, Gabor claims that the judge improperly admitted a Hungarian court document in evidence which was not translated by a certified translator. The judge, in fact, excluded this document from evidence, but properly allowed Maria to use the document to refresh her memory. There was no error in the conduct of the hearing.

Hungary to the terms of the Convention to establish the boundaries of wrongful removal and retention under Hungarian law.[13]

According to Ruling 284, a custodial parent who wishes to remove a child abroad for a period longer than one year must receive the consent of the noncustodial parent or permission from the court, otherwise the retention of the child abroad qualifies as wrongful retention. It appears, however, that the custodial parent must have formed the intention to leave for a period longer than one year prior to removing the child abroad.[14] Ruling 284 further states that the custodial parent may not permanently remove a child from Hungary without approval from the Guardianship Authority. According to Ruling 284, the Guardianship Authority is vested with rights over children of divorced or separated parents which qualify as rights of custody attributed to an institution under art. 3. Therefore, the Guardianship Authority may commence proceedings for mandatory return whenever a child has perma-

---

[13]Gabor included a certified translation of Ruling 284 in the record on appeal. According to Gabor, Ruling 284 must be followed by the lower courts and Guardianship Authorities. We have no basis for determining whether a ruling by the Civil College of the Supreme Court of Hungary has the force of law in Hungary. Because the provisions of Ruling 284 are not dispositive in this case, however, we assume for purposes of analysis that the ruling is an accurate representation of Hungarian law.

[14]The translation of Ruling 284 provided by Gabor states: "To constitute wrongfulness, it is not necessary for the retention abroad of the child for over a year to be realized: *it suffices if the parent removes the child abroad with such intention.* The intention of the parent shall be established through the assessment of all the circumstances of a given case . . . To establish wrongfulness in the case of removal or the retention abroad of the child with the intention of a prolonged stay or final settlement there, it is not necessary for the retention abroad of the child for over a year to be realized either: *it suffices if a third party removes the child abroad with such intention.*" (Emphasis supplied.) Ruling 284 does not directly address the situation presented in this case. Maria did not make contact with the court or the Guardianship Authority prior to leaving Hungary because she was not obligated to obtain permission to take the children abroad for less than one year. There is no indication in Ruling 284 that, once abroad, the custodial parent must obtain permission to retain the children abroad for a period longer than one year if the custodial parent does not intend permanently to remain abroad.

nently been removed from Hungary without the requisite permission from the Guardianship Authority, even if the noncustodial parent has consented to the removal.[15]

The provisions of Ruling 284 are not instructive in this case because, at the time she left Hungary, Maria intended to return with the children within one year. Furthermore, there is no clear indication in the record that the Guardianship Authority has commenced proceedings for mandatory return of the children on the ground that Maria intends permanently to remain in the United States. It is apparent that Gabor could have argued before the Central District Court of Budapest that Maria now intends to keep the children in the United States well beyond one year, or even permanently. The Hungarian court, however, did not apply Ruling 284 to this case or find that Maria's current retention of the children in the United States is wrongful under Hungarian law. Rather, the Hungarian court found that the best interests of the children require that Maria retain custody. In these circumstances, we conclude that the ruling of the Hungarian court constitutes a declaration under Hungarian law that Maria's retention of the children in the United States is not wrongful. See *David S. v. Zamira S.*, 574 N.Y.S. 2d 429, 432 (Fam. Ct. 1991) (custody decision by court of child's habitual residence, made subsequent to removal of child and petition for return, constitutes declaration concerning wrongfulness under art. 3). Accordingly, it would be contrary to both Hungarian law as well as Massachusetts law to

---

[15]Under the provisions of Ruling 284, it appears that neither the custodial parent nor the noncustodial parent is granted exclusive custody rights under Hungarian law, because neither parent is afforded the right to determine the children's permanent place of residence. Therefore, in circumstances such as those present in this case, the noncustodial parent may not request the mandatory return of children under the Convention, because the noncustodial parent did not exercise rights of custody at the time the children were removed from Hungary. Art. 13(a). See 42 U.S.C. § 11603(e). Apparently, the Guardianship Authority is the only party which may request the mandatory return of children in these circumstances.

mandate that the children be returned to Hungary. See G. L. c. 208, § 28 (1990 ed.); G. L. c. 209B, § 14 (1990 ed.)

2. *Effective exercise of rights of access.* A major purpose of the Convention is to protect the access rights of the non-custodial parent when the children reside in a contracting nation other than where the noncustodial parent resides. The Convention provides that the parent who has removed the children from their habitual residence, and made the exercise of access rights more difficult, may be ordered to pay the necessary expenses incurred by the noncustodial parent effectively to exercise rights of access. Art. 26. This provision is particularly relevant in a case such as this, where the average salary in Hungary is dramatically less than in the United States. The Convention also recognizes that a judge may not enter a visitation order which is impractical. By instructing the judge to remove, "as far as possible," all obstacles to the exercise of access rights, the Convention emphasizes that the judge must consider all practical limitations. Art. 21.

In this case, it is apparent that the judge considered the principles articulated in art. 21 when he determined the specific order of visitation.[16] Because he found a substantial risk that Gabor will not return the children to Maria's custody if they are sent to Hungary, the judge properly declined to issue an order that the children be returned for visitation. See note 10, *supra.* The judge ordered, however, that Gabor be granted visitation in the United States twice a year, two weeks each summer and approximately ten days each Christmas vacation period.[17] Maria was ordered to reimburse Gabor on his arrival in the United States for reasonable

---

[16]Gabor argues that the children should be returned to Hungary so that the Guardianship Authority can determine the appropriate visitation order. There is no merit to this argument. The Convention contemplates that the judicial or administrative authorities in the "requested State," or the nation in which the children currently reside, have jurisdiction over visitation matters. See Art. 21; art. 26.

[17]The judge ordered certain measures to ensure that the children are returned to Maria's custody following Gabor's visitation, including the requirement that Gabor deposit his passport with the family service office of the Probate and Family Court prior to taking the children.

travel expenses incurred. Furthermore, the judge ordered that Gabor's child support obligation be suspended to defray visitation expenses during the period the children reside in the United States.

Gabor contends that the reimbursement order renders the entire visitation order meaningless because he does not have sufficient funds, nor the ability to borrow sufficient funds, to purchase an airline ticket to the United States. He further claims that, even if he could purchase a ticket, he cannot afford living expenses for himself and the children during his stay in the United States. Thus, he argues, the visitation order is contrary to art. 21 because he cannot afford to exercise his rights of access in the United States.

We cannot assess whether the visitation order issued by the judge sufficiently protects Gabor's rights of access because Gabor did not submit any evidence of his earnings or assets at the hearing. The only evidence of Gabor's financial status was Maria's testimony that she has received 32% of Gabor's official salary, or approximately $37 a month, as child support. It is apparent that the judge concluded that Maria and Mihaly can afford to pay Gabor's travel expenses to and from the United States twice a year. There was not sufficient evidence, however, for the judge to determine whether Gabor is able to collect funds to purchase his tickets to the United States, or whether Gabor is able to pay necessary living expenses, such as hotel, motel, or other temporary housing, food and transportation, for himself and the children during visitation. Accordingly, we remand this case to the Probate and Family Court with the instruction that the parties be ordered to submit evidence from which the judge may craft an appropriate visitation order which recognizes the costs associated with visitation as well as the financial limitations of the parties.

Gabor also claims that the judge improperly limited his visitation period because the Guardianship Authority order included four weeks of visitation in the summer as well as alternate weekends throughout the year. It is Gabor's position that the judge should have entered an order which is a

"mirror image" of the Guardianship Authority order. Obviously, the Convention does not require that a mirror image visitation order be entered because such a requirement would be impractical. To the extent practical, however, the visitation order of the Guardianship Authority should be followed during the children's stay in the United States. See G. L. c. 209B, § 14 (1990 ed.). On remand, the judge may consider Gabor's request for a longer visitation period when determining the practical limits of visitation. Furthermore, the judge may consider Gabor's request for telephone contact with the children which was included in the document submitted to the United States Department of State.

3. *Attorney's fees.* Gabor argues that the judge erred in denying his request for attorney's fees because ICARA, 42 U.S.C. § 11607 (b) (3), mandates that attorney's fees and costs be awarded when a court orders the return of children pursuant to the Convention. In this case, we have found that the judge correctly denied Gabor's request that the children be returned to Hungary. Furthermore, attorney's fees and costs must be awarded only when children who have been wrongfully removed or retained under art. 3 are returned, not when children are returned under art. 18 for purposes of visitation. Therefore, there is no merit to Gabor's argument. Neither the Convention nor ICARA mandates the award of costs or fees to a party who successfully petitions for rights of access. The judge properly denied Gabor's request for attorney's fees.

4. *Disposition.* The action is remanded to the Probate and Family Court for further proceedings concerning the order of visitation consistent with this opinion. In all other respects the judgment is affirmed.

*So ordered.*