TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00580-CV






In re Jude L. Vernor







ORIGINAL PROCEEDING FROM WILLIAMSON COUNTY







 Relator Jude L. Vernor, an Australian citizen domiciled in Australia, seeks mandamus
relief from a temporary order of a county court at law in a paternity and custody action. On
September 16, 2002, the court ordered that Ms. Vernor return her seven-year-old son from her
parents' home in Australia to Williamson County, where his biological father lives, within eleven
days. The court did not order Vernor herself to return, but threatened to name the child's father,
Larry Carden (the real-party-in-interest), the primary custodial parent if Ms. Vernor failed to move
back to Williamson County with the child. Ms. Vernor alleges that she and the child fled Texas and
sought refuge in Australia to escape domestic violence by Mr. Carden. She argues, among other
things, that the order was arbitrary and unreasonable because it was impossible to comply with and
it violated her constitutional rights and the Texas Family Code. 

 Ms. Vernor filed this mandamus action and asked for a stay on September 23, 2002. 
On September 24, this Court stayed the order that the child be returned by September 27 and stayed
all proceedings in the county court at law pending resolution of the petition for mandamus relief. 
The child remains in Australia with his mother and maternal grandparents, where he has been
attending school for more than a year. After reviewing the record and the law, this Court will
conditionally grant the writ of mandamus.


BACKGROUND


 Ms. Vernor once lived, worked, and owned a home in Round Rock. In 1994, she
began a romantic relationship with Mr. Carden and a child of this union was born in Williamson
County on July 1, 1995. The parents never married. Ms. Vernor has been the child's only caregiver
since his birth. Ms. Vernor does not dispute that Mr. Carden is the child's biological father or that
he exercised visitation with the child informally. She and Mr. Carden had a sporadic and stormy
relationship. In 1995, Mr. Carden filed suit in Williamson County to establish his paternity of the
child. On November 13, 1995, temporary orders issued naming Mr. Carden and Ms. Vernor joint
managing conservators and restricting the child's domicile to Texas. Mr. Carden abandoned that
lawsuit, however, and in 1998 it was dismissed for want of prosecution. Ms. Vernor alleges that Mr.
Carden committed acts of domestic violence over the course of their relationship. At some point,
Mr. Carden began attending anger-management counseling. 

 Mr. Carden alleges that Child Protective Services was investigating the removal of
the child from Ms. Vernor's home before she disappeared in May 2001. According to Ms. Vernor,
Mr. Carden repeatedly made false reports of child neglect and abuse against her. Ms. Vernor
testified that the child protective agency determined each allegation was unfounded. She asserts that
Mr. Carden's harassment through the false reports to police and the child protective agency increased
in frequency until she left Williamson County. 

 The couple's troubled relationship erupted in a violent episode in April 2001, which
the child witnessed. The details are sketchy, but Mr. Carden struck Ms. Vernor and dragged her
some distance from her car when she and the child were attempting to flee his threats. At some
point, the then six-year-old child tried to physically defend his mother from Mr. Carden's attack. 
Ms. Vernor sought refuge in a local battered women's shelter. She applied for a protective order
against Mr. Carden in Williamson County on May 8, but her request was denied. On May 2 and 8,
Mr. Carden's attempts to visit the child at his school were thwarted. Mr. Carden alleges that on May
17, Ms. Vernor withdrew the child from school. Ms. Vernor testified that she transferred her son
to another school to protect him from his father; this was done while she and the child were still
living at the shelter. Mr. Carden involved the child protective agency in searching for Ms. Vernor
and the child. 

 Ms. Vernor and the child eventually moved to a shelter in Santa Fe, New Mexico. 
Mr. Carden somehow involved New Mexico police in searching for them. Ms. Vernor, an Australian
citizen, and her son flew to Australia to live with her parents on September 10, 2001. It is
undisputed that when she left, Ms. Vernor was unaware of any court proceedings involving her or
the child, or any custody rights awarded to Mr. Carden. 


Williamson County Default Judgment

 On June 20, 2001, after Ms. Vernor fled to New Mexico, Mr. Carden filed a second
suit in Williamson County, again seeking to establish his paternity and seeking custody of the child. 
He served Ms. Vernor with citation by publication in Williamson County, but having left Texas in
May she was unaware of the suit. (1) On September 10, the same day Ms. Vernor and the child left for
Australia, Mr. Carden obtained a default judgment in his paternity and custody suit, which has since
been vacated. (2) The "Final Decree in Paternity Suit" found Mr. Carden to be the biological father of
the child, named both parents joint managing conservators, and gave Mr. Carden the right to
establish the "primary residence of the child." The decree did not restrict the child's residence to
Williamson County or Texas. (3) On October 10, Mr. Carden secured a writ of habeas corpus for return
of the boy to Williamson County.


The Australian Proceedings

 After learning that Ms. Vernor had returned to Australia, Mr. Carden initiated an
application for the return of the child under the Convention on the Civil Aspects of International
Child Abduction (the "Convention") (4) in the Family Court of Melbourne, Australia. The Convention
is a treaty, signed by both the United States and Australia, establishing legal rights and procedures
for the prompt return of children who have been wrongfully removed from one signatory nation or
wrongfully retained in another. (5) The goals of the Convention are (1) to remove any incentive in
abducting children across international borders and (2) to ensure that the rights of custody granted
under the law of one signatory nation are effectively respected in the other signatory nations. Ms.
Vernor was notified of these proceedings in Australia on December 12, 2001; she testified, without
contradiction, that this was the first notice she received of the Williamson County paternity and
custody suit. 

 In his Convention application filed in Australia, Mr. Carden alleged that he had been
adjudicated the biological father and named a joint managing conservator of the child, citing to
temporary orders which also restricted the child's residence to Texas. His application to the
Australian court expressly stated:


5. The applicant under the Convention, LARRY JAY CARDEN, father of the
child, . . . has rights of custody in respect to the child by reason of the following
factual and legal circumstances:


 . . . . 


3. The mother and father were appointed joint managing conservators of the child
by order of the District Court at Williamson County, Texas on November 13,
1995.


 . . . .


1. The District Court of Williamson County Texas, also ordered that the child not
be removed from the physical boundaries of the State of Texas.


2. The applicant father regularly exercised his right of access and possession to the
child.

3. On or about 5 September 2001 JUDE RAE VERNOR travelled to Australia with
the child without the knowledge or consent of the applicant father LARRY JAY
CARDEN.


 . . . . 


1. The mother's removal of the child to Australia is in breach of the father's rights
of custody as defined by Article 5 of the Family Law (Child Abduction
Convention) Regulations 1986 and is therefore wrongful within the meaning of
Article 3.



Mr. Carden failed to reveal that the temporary order in his 1995 lawsuit, naming him as a joint
managing conservator and restricting the child's residence to Texas, had been dismissed in 1998 and
was no longer in effect in 2001. We find reprehensible this misrepresentation apparently made to
invoke the protections of the Convention. (6) Mr. Carden also reported to the Australian authorities
that Ms. Vernor was a mentally-unbalanced drug abuser who neglected and abused the child. 

 Unaware of Mr. Carden's misrepresentation, on December 17, 2001, the Australian
Family Court ordered that: (1) the Department of Human Services of the State of Victoria "secure
the welfare of the child"; (2) the Department investigate the allegations threatening the child's
welfare; (3) a warrant be issued for the child; (4) Ms. Vernor be restrained from removing the child
from Australia or the State of Victoria; (5) Ms. Vernor be restrained from changing the residence of
the child; and (6) the child's passport be surrendered to the Family Court. These orders are still in
effect. 

 In response to Mr. Carden's accusations, the child, Ms. Vernor, and Ms. Vernor's
parents underwent psychological evaluations and assessments by an Australian psychologist. (7) At
some point, the Australian Family Court abated its action so that the custody issue could be
adjudicated in Williamson County, as the Convention provides. See Convention on the Civil
Aspects of International Child Abduction, opened for signature Oct. 25, 1980, art. 15, T.I.A.S. No.
11,670, 19 I.L.M. 1501, 1503, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,493, 10,499 (1986)
(the "Convention") (provision allows country where child taken to request that courts, in country
from where child taken, render a decision whether removal of child was "wrongful" within meaning
of Convention).


Default Judgment Vacated

 After learning of the Williamson County default judgment, Ms. Vernor filed a motion
for new trial, alleging improper service of citation by publication, failure to appoint an attorney ad
litem for the party cited, and false testimony by Mr. Carden. Ms. Vernor asserted several defenses
to Mr. Carden's being named joint managing conservator of the child with custodial rights, including
Mr. Carden's physical abuse of her and the child. See Tex. Fam. Code Ann. § 153.002 (West 2002).

 At the hearing on the motion for new trial on May 30, Ms. Vernor attempted to testify
about Mr. Carden's acts of domestic violence. The trial court sustained Mr. Carden's objection and
limited Ms. Vernor to testifying that Mr. Carden's acts of physical violence forced her into a battered
women's shelter. On June 24, 2002, the Williamson County court vacated its September 2001
default judgment. Mr. Carden's attorney conceded at oral argument that the default judgment was
defective because an attorney ad litem was not appointed to represent Ms. Vernor's interests in that
lawsuit. See Tex. R. Civ. P. 244; Cahill v. Lyda, 826 S.W.2d 932, 933 (Tex. 1992).


The September 16 Temporary Order

 Pursuant to a pre-default request by Mr. Carden for temporary orders, evidentiary
hearings were held in Williamson County in August and September. Ms. Verner returned from
Australia for two of these hearings. At the conclusion of these hearings, on September 16, 2002, in
open court, the court orally ordered (8) Ms. Vernor to return the child to Williamson County by
September 27, only eleven days later. Ms. Vernor was ordered to send the child from Australia to
Williamson County alone or to return to Australia and accompany the child back to Texas. Ms.
Vernor objected for many reasons, including: (1) the order of the Australian Family Court prohibited
her from removing the child from Australia; (2) the fact that traveling on such short notice would
result in exorbitant airfare in excess of $6000; (3) the child was well-adjusted and attending school
in Australia and complying with the order would be very disruptive to his school schedule; (4) Ms.
Vernor faced immigration difficulties for a prolonged stay because her resident-alien status had been
revoked by the United States Immigration and Naturalization Service due to her prolonged absence
from the country; (5) Ms. Vernor had no money to move back; (9) and (6) Ms. Vernor feared for herself
and her child's safety in Williamson County. The court overruled her objections and stated its
ruling:


I do find that Larry Carden is the biological father of [the child]. I do appoint both
parents temporary joint managing conservators[.] I order that [the child] must be
returned to Williamson County by September 27th, 2002. If you, Ms. Vernor, return
to the United States in Williamson County with [the child] you may establish the
residence of [the child] in Williamson County. I hope you do return, ma'am, because
[the child] needs both of you. . . . If Ms. Vernor returns to Williamson County and
designates her intent by September 23rd to return to Williamson County, with [the
child], she will establish the residency of [the child].


. . . . 


Ms. Vernor, if you do not return to Williamson County with [the child], [the child]
will return without you and he will reside with Mr. Carden. 



Ms. Vernor sought a stay of this order in this Court, along with mandamus relief. This Court issued
a stay on September 24 and proceeded to hear oral arguments regarding mandamus relief on October
23, 2002.


HAGUE CONVENTION


 The Australian Family Court has been apprised that Ms. Vernor was proceeding to
set aside the default judgment. The Australian solicitors for both parties are aware of these
mandamus proceedings. They have requested information regarding any "decision or determination"
about whether the removal of the child to Australia was unlawful under Texas law, so as to implicate
the Convention. See Convention, art. 15, 19 I.M.L. at 1503, reprinted in 51 Fed. Reg. at 10,499. 
We understand that the Australian Family Court is awaiting an authoritative decision from Texas
courts regarding the legal status of the removal of this child under Texas law.

 The purpose of the Convention is to inhibit the abduction of children across
international borders by establishing procedures for their prompt return to their country of "habitual
residence." Convention, preamble, 19 I.L.M. at 1501, reprinted in 51 Fed. Reg. at 10,498; see also
Letter of Transmittal from the White House to the Senate, Oct. 30, 1985, 51 Fed. Reg. at 10,496. 
The Convention operates to restore the status quo as it existed before the wrongful removal of a child
in a signatory nation. England v. England, 234 F.3d 268, 271 (5th Cir. 2002). Congress
implemented the Convention by enacting the International Child Abduction and Remedies Act
("ICARA"). 42 U.S.C.A. §§ 11601-11610 (West 1988). ICARA grants concurrent jurisdiction to
state and federal courts to determine the merits of an abduction claim under the Convention, but not
the merits of the underlying custody battle. Id. § 11603(a); England, 234 F.3d at 271. 

 To be entitled to relief under the Convention, an applicant must establish that (1) he
or she had "rights of custody" of the child at the time of the removal of the child and was exercising
those rights; (2) the child was removed from the child's habitual residence; and (3) the removal
breached the applicant's "rights of custody." See Meredith v. Meredith, 759 F. Supp. 1432, 1434 (D.
Ariz. 1991); Flores v. Contreras, 981 S.W.3d 246, 249 (Tex. App.--San Antonio 1998, pet. denied). 
The relief available is an order for the automatic and mandatory return of the child to its country of
habitual residence. Convention, art. 12, 19 I.L.M. at 1502, reprinted in 51 Fed. Reg. at 10,499. 

 The first issue is determining the child's "habitual residence," an undefined term in
the Convention that was intended to be applied to the facts and circumstances of each case. See
Rydder v. Rydder, 49 F.3d 369, 373 (8th Cir. 1995); Convention, art. 4, 19 I.L.M. at 1501, reprinted
in 51 Fed. Reg. at 10,498. One federal court has described the "habitual residence" as the place
where the child has been physically present for an amount of time sufficient for acclimatization and
which has a "degree of settled purpose" from the child's perspective. Feder v. Evans-Feder, 63 F.3d
217, 224 (3d Cir. 1995) (quoting Re Bates, No. CA 122-89, High Court of Justice, Family Div'l Ct.,
Royal Courts of Justice, United Kingdom (1989)). In this case, the child's "habitual residence" in
September 2001 was in Texas. (10) Thus, Ms. Vernor removed the child from his "habitual residence"
when she returned with him to Australia. 

 The next issue is determining whether the child's removal from his habitual residence
was in breach of Mr. Carden's rights of custody. Article 3 of the Convention provides that whether
the party requesting return is truly vested with the right of custody is based on the "law of the State
in which the child was habitually resident immediately before the removal or retention." 
Convention, art. 3, 19 I.L.M. at 1501, reprinted in 51 Fed. Reg. at 10, 498. Therefore, Texas law
governs the rights of custody and wrongful removal issues.

 Rights of custody (11) are defined in article 5 of the Convention as rights "relating to the
care of the person of the child." Id., art. 5. An order of return is available only for wrongful
removals; there is no right of return under the Convention if the child was not taken in breach of the
applicant's custody rights. Croll v. Croll, 229 F.3d 133, 137-38 (2d Cir. 2000), cert. denied, 122 S.
Ct. 342 (2001); Teijeiro-Fernandez v. Yeager, 121 F. Supp. 2d 1118, 1125 (W.D. Mich. 2000); 
Bromley v. Bromley, 30 F. Supp. 2d 857, 861 (E.D. Pa. 1998); Viragh v. Foldes, 612 N.E.2d 241,
246-50 (Mass. 1993). (12) The applicant bears the burden to prove rights of custody and wrongful
removal. Croll, 229 F.3d at 138.

 At the time Ms. Vernor removed the child to Australia, Mr. Carden had no custodial
rights under Texas law. Ms. Vernor alone had rights of custody to the child and she was the only
person empowered to determine the child's primary residence. Because the parties never married,
Mr. Carden had to legally establish his paternity to be named a parent with custodial rights. His
1995 suit to establish paternity was dismissed for want of prosecution in 1998. On September 10,
2001, when she left for Australia, Ms. Vernor was the only legally recognized parent of the child,
the only person with custody rights, and the only person authorized to determine the child's
residence. Although Mr. Carden was informally recognized as the boy's father and had informally
spent time with the child, Mr. Carden had no legal rights to paternity, custody, or access when Ms.
Vernor returned to Australia with the child. Thus, under Texas law the removal of the child was not
wrongful.

 By obtaining a default judgment decreeing his paternity and his custody rights on the
same day that Ms. Vernor and the child had earlier departed for Australia, without any actual notice
of the pending suit, Mr. Carden did not obtain custody rights that were breached by her departure. 
The default judgment was defective and has been vacated. The earlier suit for paternity had been
dismissed and conferred no rights of paternity on Mr. Carden. It is undisputed that Ms. Vernor did
not have actual knowledge of Mr. Carden's suit, much less the default judgment, when she left this
country.

 As Mr. Carden's attorney conceded in oral arguments, this child was not wrongfully
removed from Texas and Mr. Carden is not entitled to an order of return under the Convention. The
only order from a Texas court concerning Mr. Carden's paternity and custody rights is the temporary
order pronounced in open court on September 16, 2002, more than one year after Ms. Vernor and
the child returned to Australia.


MANDAMUS RELIEF


 Generally, an appellate court issues a writ of mandamus to correct a clear abuse of
discretion when there is no adequate remedy at law. Walker v. Packer, 827 S.W.2d 833, 839 (Tex.
1992). A court abuses its discretion when it reaches a decision so arbitrary and unreasonable that
it amounts to a clear and prejudicial error of law. Id.; Johnson v. Fourth Court of Appeals, 700
S.W.2d 916, 917 (Tex. 1985); In re Wallingford, 64 S.W.3d 22, 24 (Tex. App.--Austin 1999, orig.
proceeding). Mandamus will lie to remedy a clear failure by the trial court to analyze and apply the
law correctly. See Walker, 827 S.W.2d at 840. It is available to correct a trial court's deprivation
of fundamental constitutional rights. See, e.g., Republican Party v. Dietz, 940 S.W.2d 86, 94 (Tex.
1997). Finally, mandamus is an appropriate remedy when a court abuses its discretion involving
temporary orders (13) in a suit affecting the parent-child relationship. Dancy v. Daggett, 815 S.W.2d
548, 549 (Tex. 1991); In re Lemons, 47 S.W.3d 202, 204-05 (Tex. App.--Beaumont 2001, orig.
proceeding). 

 In a suit affecting the parent-child relationship, the court may make temporary orders
on a range of issues "for the safety and welfare of the child." Tex. Fam. Code Ann. § 105.001(a)
(West 2002). We believe that a court abuses its discretion in imposing temporary orders without due
regard for the current living situations of the parties, especially the stability of the child's current
living situation, and without regard for the financial or practical ability of the parties to comply with
the court's orders. See id; cf. Dancy, 815 S.W.2d at 549 (holding court abused its discretion in
failing to reset hearing on temporary custody and child support orders when father's attorney could
not attend hearing due to docket setting conflicts); In Re McCoy, 52 S.W.3d 297, 301-02 (Tex
App--Corpus Christi 2001, orig. proceeding) (stating mandamus particularly appropriate when court
enters void temporary orders in a child custody case because of "tremendous burden" complying
with such orders can entail, especially when valid contradictory orders have been entered by court
in another state).

 In resolving this difficult international custody dispute, the trial court must keep in
mind that although a Texas father wants access to his child, an Australian mother who was never
married to the child's father violated no court orders when she took the child to live with her family
in Australia. Perhaps the trial court assumed the mother acted wrongly in leaving with the child for
Australia. We have held that she did not. The court's temporary order is unreasonable in light of
this holding and must be reassessed. There was no emergency that justified the court's order that
the child and the mother return to Texas within eleven days, and even more arbitrary was the
suggestion that the seven-year-old child return alone, from Australia to Texas, if the mother was
unable to accompany him on such short order. The trial court threatened the mother that if she failed
to return, the court would award the father the primary right to determine the residence of the child,
even though this father admitted committing acts of violence toward the mother, and there have been
subsequent allegations of inappropriate acts towards the child. (14) The court's order seemed to reflect
its anger with the mother rather than appropriate concern for the best interest of the child. See
Saavedra v. Schmidt, No. 3-01-638-CV, 3-01-639-CV, 2002 Tex. App. LEXIS 7762, *41 (Tex.
App.--Austin Oct. 31, 2002, n. pet. h.) (indicating Texas court justified in exercising temporary
emergency jurisdiction to protect children from California court's temporary custody orders entered
to punish parent rather than to address best interest of children).

 Furthermore, the court's order that the mother return for an extended period before
the custody dispute is resolved ignored the reality that the mother is a nonresident who no longer has
a green card enabling her to work in this country. The very real immigration difficulties of the
mother, including her current inability to support herself in this country, coupled with the child's
inability to travel because of the surrender of his passport temporarily to the Australian court,
requires a more thoughtful resolution than that ordered by the trial court. The court's arbitrary and
capricious treatment of the parties' situation is further exemplified by the denial of the mother's
request that she be allowed to live with friends in Travis County upon her return, rather than in
Williamson County where she has no place to live and no way to support herself, and by the court's
requirement that the child attend school in the county of the father's residence during the pendency
of this custody dispute. 

 Considering that the child has been living in Australia for over a year, it was 
unreasonable to so abruptly disrupt the child who is settled into his Australian school, where the
evidence is that he is performing well. (15) It appears that the mother's return to live with her parents
on their farm in Australia has afforded this seven-year-old boy the first stable environment he has
enjoyed in his young life--a stability undermined in Texas by the volatility and hostility that
characterized the relationship between his mother and father. The boy's maternal grandparents, in
particular his grandfather, have been good role models. These are all factors the court must take into
account in entering temporary orders that disrupt the child schooling and stable family relations
before any final custody decision is reached. Temporary orders must consider the best interest of
the child as well as the convenience of the court and the needs of these feuding parents. If the boy's
presence is required in Texas prior to a determination of the custody rights of his parents, the trial
court should attempt to avoid disrupting the child's education and might take into account the
extended recess between terms in the Australian school year so that any travel will be less disruptive
of the child's schedule.

 By requiring the mother and child to return to Texas without regard for their present
circumstances, the Texas court seems to assume an outcome in the custody proceeding. Such an
approach may have been based on the misrepresentation that the mother "wrongfully" removed the
child from Texas, but the trial court must afford due regard to all reasonable possibilities that might
be in this child's best interest. Just as more care must be exercised in crafting appropriate temporary
orders, great skill will be required in balancing the rights of these hostile parents, who have not
always exercised good judgment in the past, but who have both demonstrated their strong desire to
parent this child. The difficulty of resolving their conflicts is aggravated by the distance between
their homes in Texas and Australia. However, the court's paramount concern must be to seek
temporary and permanent arrangements that will promote the best interest of the child, wherever that
may be. 

 In making temporary orders compelling the parties or the child to travel, the court
must take into account the financial abilities of the parties. The trial court should consider the range
of possibilities for discovery and evaluation that would serve the best interest of the child while this
suit is pending. Having reviewed the record, including the depositions conducted with witnesses in
Australia by satellite, we question the court's insistence on requiring the mother and child to be
present in Texas to be evaluated when such technology makes trans-continental communication
effective. This is especially true in light of the limited means of both parties to this custody dispute. 
The means of discovery must be tailored to the means of the parties to afford them. For example,
when psychological evaluations of the child, the mother, and the maternal grandparents have been
conducted in response to the suit filed by the father in Australia, and the depositions of those
professionals have been taken via satellite with ample opportunity for cross-examination by counsel
for the father, the court must consider the financial burden of requiring that all such evaluations be
repeated in Texas.

 In assessing financial responsibility for whatever arrangements the court settles on
to enable it to finally resolve this custody dispute, the court must seek to divide equitably between
the two parties the financial obligations for professional evaluation, travel, interim support of the
child, and other costs. It must also assure regular telephone access between the father in Texas and
the child while he remains in Australia, perhaps permitting the father access to the child in Australia
until this dispute is finally resolved. In its temporary orders, the trial court may impose whatever
arrangements insure access to the child in the most reasonable manner.

 We are sympathetic with the trial court's difficult challenge in making appropriate
temporary orders that will enable it to equitably resolve this custody dispute in a timely and
appropriate manner. The distance between the two countries and the limited means of the two
parents must be considered. So must the immigration status of the mother and her ability or inability
to support herself in this country be considered. Of no less importance is respect for continuity and
stability in this child's life, something he has had little of in his seven years. What would most help
the court would be some cooperation from these parents in service of what is best for the child they
both seem to care for, even though they care little for each other. We conditionally grant the writ
of mandamus, assured that the trial court will withdraw its temporary order of September 16, 2002,
in favor of new orders that take into account the concerns we have expressed.


CONCLUSION


 We conditionally grant the writ of mandamus. The parties are ordered to provide
their Australian solicitors with copies of this decision within twenty-four hours of receiving it.



 __________________________________________

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Filed: November 26, 2002

Publish

1. The fact that Mr. Carden involved the New Mexico police in searching for Ms. Vernor in
that state in May tends to show that Mr. Carden was aware that Ms. Vernor was not physically
present in Williamson County. 
2. Ms. Vernor testified that she and her son departed for Australia on a pre-dawn flight on
September 10, so that she was not in the country when the default judgment was signed, and she was
unaware of the lawsuit or the judgment.
3. The earlier 1995 temporary orders that did restrict the child's residence to Texas had been
dismissed in 1998, long before Ms. Vernor left for Australia.
4. Convention on the Civil Aspects of International Child Abduction, opened for signature
Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg.
10,493, 10,498 (1986) [hereinafter the "Convention"]. 
5. Id. art. 1, 19 I.L.M. at 1501, reprinted in 51 Fed. Reg. at 10,498; Miller v. Miller, 240 F.3d
392, 394 (4th Cir. 2001).
6. At oral argument, counsel for Mr. Carden acknowledged that Ms. Vernor's removal of the
child to Australia was not wrongful and that the Convention's protection was improperly invoked.
7. This psychologist's deposition was taken via satellite in conjunction with the Texas custody
litigation, and a tape of the deposition was made a part of the record in this proceeding.
8. The court's various orders announced on September 16 have not been reduced to writing
and signed by the court. If a court's order is adequately reflected in the reporter's record, a formal
written order is not essential to obtaining mandamus relief. In re Perritt, 973 S.W.2d 776, 779 (Tex.
1998); see also Tex. R. App. P. 52.3(j)(1)(A).
9. Ms. Vernor alleges that she sold her house in Williamson County when she was staying
at the women's shelter. She claims that she has spent the sales proceeds for lawyers in Texas and
Australia.
10. Although Ms. Vernor and the child briefly stayed in New Mexico after leaving Texas and
before traveling to Australia, Texas remained the child's "habitual residence."
11. "Rights of custody" may arise by judicial or administrative decision or by operation of law.
Unlike the Uniform Child Custody Jurisdiction and Enforcement Act, Tex. Fam. Code Ann.
§§ 152.001-.317 (West 2002), obtaining relief under the Convention does not require a prior court
order. Flores v. Contreras, 981 S.W.3d 246, 248 (Tex. App.--San Antonio 1998, pet. denied)
(citing Convention, Text and Legal Analysis, 51 Fed. Reg. at 10,505).
12. Mere rights to visitation do not constitute "rights to custody"; rather, visitation rights are
"rights of access" within the meaning of the Convention. Croll v. Croll, 229 F.3d 133, 137-38 (2d
Cir. 2000), cert. denied, 122 S. Ct. 342 (2001). The Convention distinguishes "rights of custody"
from "rights of access," defining the latter as "the right to take a child for a limited period of time
to a place other than the child's habitual residence." Convention, art. 5b, 19 I.L.M. at 1501,
reprinted in 51 Fed. Reg. at 10,498. The Convention provides remedies for a party whose rights of
access are breached, but those remedies do not include an order of return. Id. art. 21, 19 I.L.M. at
1503, reprinted in 51 Fed. Reg. at 10,500. The available remedies are in the nature of administrative
efforts to obtain visitation, including requiring the resisting parent to pay the travel expenses of the
parent whose visitation rights have been frustrated. See, e.g., Bromley v. Bromley, 30 F. Supp. 2d
857, 860 n.4 (E.D. Pa. 1998); Viragh v. Foldes, 612 N.E.2d 241, 246-50 (Mass. 1993); Convention,
art. 21, 19 I.L.M. at 1503, reprinted in 51 Fed. Reg. at 10,500.
13. There is no adequate remedy by appeal from temporary orders because they are not
appealable. See Little v. Daggett, 858 S.W.2d 368, 369 (Tex. 1993); In re Powers, 974 S.W.2d 867,
869 (Tex. App.--Houston [14th Dist.] 1998, orig. proceeding).
14. These allegations involved two separate instances and were reported by the child to the 
Australian psychologist verbally and through drawings. These alleged acts included striking and
pulling the child's genitals.
15. Both the psychologist and the child's teacher in Australia testified by satellite deposition
that the child has adapted well to his new surroundings and is progressing well in school 
academically and socially.